## EVANSVILLE COURIER v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4769.

Circuit Court of Appeals, Seventh Circuit.
Dec. 20, 1932.

John E. McClure, of Washington, D. C. (Maud Ellen White and Miller & Chevalier, all of Washington, D. C., of counsel), for petitioner.

G. A. Youngquist, Asst. Atty. Gen., Sewall Key and Wm. Cutler Thompson, Sp. Assts. to Atty. Gen., and Dwight H. Green, of Washington, D. C. (C. M. Charest, General Counsel, Bureau of Internal Revenue, and P. A. Sebastian, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

EVANS, Circuit Judge.

Was the $15,000 item in dispute properly included in petitioner's 1920 income?

In January, 1920, petitioner was organized to acquire the assets, tangible and intangible, of the Evansville Courier Publishing Company, which for many years had published a newspaper at Evansville, Indiana, and transacted a prosperous associated business and acquired a desirable reputation and a valuable good will. The capital stock of petitioner was fixed at $500,000; $200,000 of which was common and $300,000 of which was preferred stock. Par value was $100. One Henry W. Marshall was instrumental in organizing petitioner, and he conducted the negotiations for the purchase of the assets of the Evansville Courier Publishing Company. The latter company conveyed the property to him, and on the same day (January 31, 1920) he conveyed it to petitioner.

Petitioner's method of paying the consideration of its purchase differed somewhat from that provided by Marshall for his payment of the purchase price to the original seller. More cash was required from Marshall to make his purchase. In both contracts, however, a provision to this effect appeared:

"In addition to the transfer, conveyance and delivery of the foregoing property and assets, the transferor hereby pays to the transferee the sum of Fifteen Thousand Dollars ($15,000) in cash, receipt of which is hereby acknowledged through the acceptance of this instrument *to cover the unearned part of prepaid newspaper subscriptions.*"

This recital in the bill of sale was amplified by the testimony of Marshall who said:

"We had practically agreed upon the price for the property; of course, I was trying to get the lowest price * * * and being a newspaper man, I knew that there were subscriptions,—unearned subscriptions which had been paid in advance through a bargain month in November. I considered those sub-

scriptions as both a liability and an asset, because a newspaper without circulation can not do business very long,—the rate is too low and there is nothing to be earned in subscriptions in the way of profits,—it comes through advertising, and advertising rates are based wholly upon circulation. Therefore, in an effort to reduce the price, I finally got an agreement from them to pay back fifteen thousand dollars; there were two objects in view on that, first to lower the cost of the property; secondly to get cash as working capital into the treasury of the company; when I sold the paper, then to the * * *, I made the same arrangement and turned over $15,000 in cash."

█ In the face of this testimony, we fail to appreciate how the Board of Tax Appeals reached its conclusion that this sum of $15,000 was part of petitioner's gains and profits and subject to an income tax.

It is apparent from Marshall's testimony that the parties were engaged in the popular practice of "trading" as their negotiations neared completion. The transaction was a sizable one, involving over a half million dollars. The method of payment, as well as the total consideration, was an important factor in the transaction and the subject of bargaining. The property sold was largely intangible, and its value depended to a large degree upon the newspaper's circulation. It is obvious, we think, that a subscription contract evidences a value beyond the amount of the payment called for therein. A subscriber generally continues his subscription. The list of subscribers therefore is indicative of good will and is some evidence of the going value of a newspaper. On the other hand, the extent to which this subscription has run, the subscriber having prepaid the price thereof, has, no doubt, some, though rather small, bearing, on the value of the good will as evidenced by the subscription list.

Both the provision of the bill of sale and the testimony of Marshall are persuasive of the conclusion that when the trading between the parties ceased and the entire agreement was consummated, the purchaser had worked the purchase price down $15,000. Petitioner's desire for ready cash for working capital, as well as the fact that the other figures had been agreed upon and could not be readily changed, made it advisable to insert this item into the agreement as a separate provision. This $15,000 was not part of petitioner's gains and therefore was not a part of its taxable income. It was an item which bore on the purchase price. So far as peti-

tioner's income tax is concerned, it was material only in so far as it affected petitioner's invested capital.

Was petitioner's invested capital correctly determined by the Board of Tax Appeals?

The property acquired by the petitioner was of the aggregate value of $619,220.76. Of this total the tangible property was valued at $169,231.73 and the intangible at $449,989.03. Petitioner paid $84,600 in cash, all of which represented money by it borrowed, and it assumed $34,620.76 of liabilities and issued $500,000 worth of capital stock for the property it acquired.

█ The point of contention is over the division of the $84,600 cash item, which was borrowed money and therefore could not be included in invested capital. Petitioner asks that this sum be apportioned between the tangible and intangible property in the ratio of the values of said properties, that is, 169 to 449. Respondent argues for the application of the payment of this $84,600 on the tangible property only and for its position relies upon Treasury Regulations 45.[1] Supporting respondent's position are numerous rulings of the Board of Tax Appeals. Pennsylvania Central Brewing Co., 9 B. T. A. 264; Pharos-Reporter Publishing Co., 1 B. T. A. 879; Acme Manifolding Co., 24 B. T. A. 429. The regulation is not at variance with any statute. It has long been in force and governed the rulings of the Internal Revenue Collector on similar questions. It is therefore entitled to added weight. Gann v. Commissioner (C. C. A.) 61 F. (2d) 201.

This Treasury Regulation carried out the theory of the congressional enactment represented by subdivisions (4) and (5) of section 326 (a), Revenue Acts 1918 and 1921 (40 Stat. 1092; 42 Stat. 274), which subdivisions, for the purpose of determining income taxes, classify invested capital into two classes—tangible and intangible property— and give to the latter a status beneath that of tangible property.

---

[1] "Art. 835. Tangible property paid in: mixture of tangible and intangible property.—Where stock or shares and bonds or other obligations have been issued for a mixed aggregate of tangible and intangible property, it will be presumed in the absence of satisfactory evidence to the contrary that the bonds were issued for tangible property and that the stock was issued for the balance of the tangible property, if any, and for the intangible property. Where stock or shares have been issued for a mixed aggregate of tangible and intangible property and certain liabilities have been assumed in connection with the transaction, it will be presumed that such liabilities are to be charged against the tangible property and the intangible property in the order named, unless it is shown by evidence satisfactory to the Commissioner that this presumption is not in accordance with the facts."

Invested capital as that term is used in this statute has a restricted meaning. Intangible property is included therein only because of subdivisions (4) and (5) of said section 326 (a). Congress saw fit to restrict the intangible property included in invested capital to an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25% of the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year, whichever is lowest.

The question presented, therefore, is not one of relative value of tangible and intangible property in the newspaper business. For the purpose of determining petitioner's rate of return on its invested capital, the Commissioner had first to look to the statute to ascertain what was includable in invested capital. He was then required to divide the taxpayer's property into tangible and intangible property so as to apply section 326 (a) subdivisions (4) and (5).

Irrespective of Regulations 45 we think the Commissioner was justified in applying the cash payment on the tangible property rather than on the purchase price of the intangible property, where the parties in their agreement have failed to provide for its allocation.

The order of the Board of Tax Appeals is reversed and the cause remanded, with directions to adjust the petitioner's tax in accordance with the views expressed in this opinion.