**SEARS OIL CO., Inc., Petitioner on Review,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent on Review.**

No. 139, Docket 29970.

United States Court of Appeals Second Circuit.

Argued Jan. 5, 1966.

Decided April 12, 1966.

Harry L. Brown, Washington, D. C. (Alvord & Alvord, Washington, D. C., and Richard O'C. Kehoe, Utica, N. Y., with him on the brief), for petitioner.

Thomas Silk, Jr., Washington, D. C. (Richard M. Roberts, Acting Asst. Atty. Gen., and Meyer Rothwacks and David O. Walter, Washington, D. C., with him on the brief), for respondent.

Before MOORE, SMITH and ANDER-SON, Circuit Judges.

MOORE, Circuit Judge:

This is a petition for review of a decision of the Tax Court. The petitioning taxpayer, Sears Oil Co. (Sears), is a distributor of petroleum products in north-central New York State. The Commissioner of Internal Revenue asserted in a notice of deficiency that taxpayer underpaid its federal income tax for the years 1957 and 1958 by $60,637.-40 and $51,560.74, respectively. The

Commissioner maintained that taxpayer was subject to an accumulated earnings tax for the years in question, and in addition disallowed certain deductions taken for those years. Taxpayer petitioned the Tax Court for review of the asserted deficiencies. The Tax Court generally upheld the position of the Commissioner, although it reduced the amount of the deficiencies to $58,781.65 for 1957 and $41,414.43 for 1958. 24 CCH Tax Ct. Mem. 207 (1965).

1. *Was Taxpayer Subject to Accumulated Earnings Tax for the Years 1957 and 1958?*

Under Section 532(a) of the Internal Revenue Code of 1954, the accumulated earnings tax applies to every corporation "availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed." Under Section 533(a),

> "the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary."

■ Since taxpayer did not submit a statement under Section 534(c) after it received a notification under Section 534(b) that a proposed notice of deficiency included an amount with respect to the accumulated earnings tax, the burden of proof remained with taxpayer. See R. Gsell & Co. v. Commissioner, 294 F.2d 321 (2d Cir. 1961).

As in most accumulated earnings cases, the pivotal question is whether earnings were allowed to accumulate beyond the reasonable needs of the business. The question does not lend itself to punch card solution since every stencil is different. Each business has its own history, its own problems and managerial policies. Previous cases at best supply general principles for guidance. The record in the present case indicates the difficulty of the task and the need for care in the application of standards.

The stipulation of facts and the testimony at trial furnish the following picture of the activities of taxpayer and related companies. Sears and companies under common ownership with it (the affiliates) engage in the petroleum products business. One company, Sears Realty Co., Inc., holds title to 10 of 12 gasoline service stations operated by Sears under a lease. Another, Sears Apartments, Inc., held title to the office building where the companies were located. The sole asset of a third company (Rome Transportation Co.) is a barge used to transport petroleum products in the Hudson River and the Barge Canal, for Sears and other oil companies. A fourth company, Sears Petroleum and Transport Corporation, owns and operates a deep water terminal at Albany, N. Y., and a fifth, M. A. Co., a partnership, operates a gasoline service station. Neither Sears nor any of the affiliated companies ever has paid a dividend, except stock dividends. Sears' earned surplus rose steadily and uniformly from $549,699.67 in 1948 to $1,114,841.33 in 1958 (including transfers to capital).

Prior to 1953 Sears engaged mostly in the sale of gasoline through leased service stations and in the sale of kerosene and fuel oil for domestic use. Beginning in 1953, however, Sears determined to expand into the heavy fuel oil business, for sale to industrial and institutional customers. Accordingly, the related companies began construction of a barge terminal and heavy oil storage facility, completed in 1955 for lease to Sears, and a deep-water terminal and heavy oil storage facility in Albany, used to handle oil cargoes directly from ocean-going tankers. This facility was partially completed in 1957 and leased to Sears. Sears itself began construction of additional storage facilities with 400,000 barrel heavy oil capacity, and in 1957 purchased two oil barges, at a cost of about $450,000, and outfitted them.

Relevant financial data follow:

| Dec. 31 | Gross Sales | Inventory | Notes & accounts receivable | Fixed assets after depreciation | Cash & unrelated investments | Taxable net income | Net income after taxes | Earned surplus & retained earnings |
|---|---|---|---|---|---|---|---|---|
| 1948 | Unavailable | $ 701,269.64 | $109,423.40 | $143,754.16 | $140,130.64 | $107,579.73 | $ 68,200.56 | $340,342.64 [1] |
| 1949 | Unavailable | 502,535.70 | 233,749.51 | 204,684.08 | 163,885.76 | 75,456.51 | 47,358.09 | 388,469.12 |
| 1950 | $1,801,457.17 | 722,176.16 | 280,538.67 | 266,271.19 | 188,677.28 | 93,815.14 | 59,644.20 | 448,113.32 |
| 1951 | 2,178,265.46 | 795,331.37 | 372,311.17 | 296,186.55 | 109,079.91 | 117,136.94 | 63,772.73 | 501,944.00 |
| 1952 | 2,502,698.87 | 794,658.38 | 393,508.86 | 247,278.59 | 92,197.70 | 112,736.91 | 60,212.18 | 562,179.42 |
| 1953 | 3,075,940.98 | 648,030.74 | 470,099.11 | 195,870.39 | 113,542.24 | 112,193.47 | 59,949.57 | 622,095.43 |
| 1954 | 3,537,630.94 | 899,555.30 | 426,057.16 | 180,461.27 | 99,694.66 | 167,134.40 | 86,334.91 | 708,430.34 |
| 1955 | 3,933,412.12 | 1,466,097.69 | 573,101.01 | 239,398.85 | 80,335.24 | 161,512.48 | 83,660.70 | 792,091.04 |
| 1956 | 4,522,959.43 | 2,121,040.96 | 421,923.52 | 209,166.06 | 125,863.00 | 180,578.85 | 92,666.70 | 882,339.49 |
| 1957 | 5,429,075.41 | 3,074,992.50 | 842,348.82 | 636,339.29 | 156,814.64 | 203,968.66 | 105,024.67 | 987,364.16 |
| 1958 | 6,945,519.32 | 3,085,925.67 | 747,680.01 | 845,172.33 | 218,096.94 | 246,319.95 | 125,266.96 | 214,841.33 [2] |

1 After transfer to the capital account of $209,357.03.
2 After additional transfer to the capital account of $900,000.

Other data include:

| ASSETS: | 1956 | 1957 | 1958 |
|---|---|---|---|
| Cash | $ 106,893.25 | $ 90,319.89 | $ 146,551.99 |
| a/c's receivable | 421,923.52 | 837,885.72 | 744,738.67 |
| Inventory | 2,121,040.96 | 3,074,992.50 | 3,085.925.67 |
| Loans | —— | 4,463.10 | 2,941.34 |
| Other Investments | 18,969.75 | 66,494.75 | 66,544.95 |
| Net depreciable fixed assets | 197,160.31 | 624,333.54 | 833,166.58 |
| Land | 12,005.75 | 12,005.75 | 12,005.75 |
| TOTAL | $2,877,993.54 | $4,710,495.25 | $4,891,874.95 |

| LIABILITIES AND CAPITAL: | 1956 | 1957 | 1958 |
|---|---|---|---|
| a/c's payable | $ 574,886.44 | $ 558,598.96 | $ 823,902.85 |
| Notes | 1,022,950.00 | 2,754,383.33 | 2,518,466.89 |
| State Tax | 9,905.46 | 11,204.81 | 13,494.83 |
| Federal Tax | 87,912.15 | 98,943.99 | 121,052.99 |
| Capital | 90,642.97 | 90,642.97 | 90,642.97 |
| Surplus | 1,091,696.52 | 1,196,721.19 | 1,324,198.36 |
| TOTAL | $2,877,993.54 | $4,710,495.25 | $4,891,874.95 |

The 1957 increase in notes payable allegedly reflects a $3,000,000 line of credit extended Sears by the Marine Midland Bank. According to the testimony of a loan officer of that bank, the credit was made available on the understanding that all moneys owed by Sears to affiliated companies and/or the Sears family were to be subordinated to the bank loans, no dividends were to be paid, the capital surplus was to be built up by transfers from earned surplus, salaries were not to be increased and balances of 15% to 20% of the credit line would be maintained with the bank. The credit was also to be guaranteed by Howard P. Sears, Sr., and two affiliated companies and supported by $700,000 in securities. The loan outstanding at the end of 1957 was $2,110,000 and at the end of 1958 $1,362,000.

As Sears leased much of its plant and equipment from the related companies, large rental payments became due. Since Sears reported on the accrual basis, the rent was deducted. Large amounts, however, were not paid. The related companies, also on the accrual basis, reported all rent as income. The amounts unpaid were reflected in Sears' books as accounts payable; in 1957 they amounted to $362,440.00 and in 1958 to $536,096.08. Additionally, the companies and members of the Sears family were said to be owed money by Sears on interest-free demand notes, which amounted to $748,-950.00 at the end of 1957 and to $733,-466.89 at the end of 1958.

On the basis of the stipulation and testimony just summarized, the Tax Court found that Sears had been availed of for the proscribed purpose. The Tax Court relied on the following factors: (1) the absence of cash dividends; (2) taxpayer's ability to carry on its business largely with borrowed capital; (3) the accumulation of earnings beyond reasonable business needs; (4) the substantial completion of taxpayer's expansion before the years in issue; (5) the absence

of a plan for expansion; (6) taxpayer's substantial investments in unrelated enterprises; and (7) taxpayer's "long-established policy of increasing its outstanding capital obligation through the declaration and distribution of stock dividends, with, in each case, a transfer of its earnings to capital."

■ The Tax Court appears to have put considerable emphasis on taxpayer's policy of transferring surplus to capital and issuing stock dividends. The court indicated at the start of trial that it considered the capitalization of surplus "pretty strong evidence" that the company was subject to the accumulated earnings tax, although "maybe" taxpayer could explain it. The same factor recurs in the court's opinion. The transfer from earned surplus to capital merely reduced the amount of earned surplus on the books; it was not a factor leading to the conclusion of unreasonable accumulation. Gunlocke Chair Co. v. Commissioner, 145 F.2d 791 (2d Cir. 1944), cited by the Tax Court, contains nothing to suggest that the capitalization of surplus is strong evidence of improper accumulation of earnings.

■ Of the other factors mentioned by the Tax Court, the absence of a formal plan of expansion in some situations could be relevant, but is hardly determinative in a company of this size. The president of the company testified that starting in 1953, taxpayer and its affiliates moved increasingly into the business of distributing heavy fuel oil. While much of the physical facilities for this expansion had been finished by 1957,* taxpayer purchased two oil barges at a cost of roughly $450,000 in 1957, and the increase in gross sales—from $4,-522,959.43 in 1956 to $6,945,519.32 in 1958—indicates that an expansion in inventory was necessary during the years in question.

■ We do not think taxpayer's ability to finance its business by borrowing by itself indicates the presence of the proscribed purpose. Section 531 does not bar taxpayer from endeavoring to reduce its borrowing and to become self-financing. See National Yarn Corp., 9 CCH Tax Ct. Mem. 603, 610 (1950); cf. R. Gsell & Co. v. Commissioner of Internal Revenue, 294 F.2d 321, 327 (2d Cir. 1961).

■■ If a taxpayer were able to build up significant investments in unrelated enterprises, this might well be a factor indicating accumulation beyond reasonable business needs, but here taxpayer's investments in unrelated businesses appear to have been comparatively small (roughly $66,000) and are asserted to, and may, have been pledged as collateral for loans under lines of credit. And, of course, the absence of cash dividends is relevant, see The Factories Investment Corp. v. Commissioner of Internal Revenue, 328 F.2d 781 (2d Cir. 1964), although not by itself determinative, see Electric Regulator Corp. v. Commissioner of Internal Revenue, 336 F.2d 339 (2d Cir. 1964).

■ As to the reasonableness of taxpayer's inventory build-up, we are offered statistics and ratios of inventory to sales for a variety of businesses and certain other proof. Such statistics are of some help; but what is reasonable for one business may be imprudent for another. Because of the climatic conditions in the Albany-Syracuse area, the inventory required to supply Sears' customers during the many months when the Erie Canal is closed to barge traffic may well have to be large in relation to other fuel suppliers located in more temperate zones. A fair determination of the question of reasonableness of inventory requires a study of the composition of inventory as between different products; of whether different products require different inventory practices; of the extent to which inventory must be built up because of transportation difficulties in winter; of the extent to which inventory build-up was necessary to meet lenders' credit requirements; of the financing of inventory; and so forth. It is somewhat of an oversimplification to say as a generality that to the extent that surplus has been translated into inventory or oth-

er assets related to the business, "the corporation may accumulate surplus with impunity." Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue, 274 F.2d 495, 501 (4th Cir.), cert. denied, 362 U.S. 976, 80 S.Ct. 1061, 44 L.Ed.2d 1541 (1960). The inventory must be needed in the business; to the extent that it is not, it cannot be accumulated with impunity.

■ A reading of the record leaves us with a "definite and firm conviction," Casey v. Commissioner of Internal Revenue, 267 F.2d 26, 31 (2d Cir. 1959), that a substantial part or possibly all of Sears' 1957 and 1958 earnings may well have been reasonably needed for the business and that their retention, in whole or in part, in the business in lieu of distribution by way of dividends to the stockholders was not an attempt to use the corporation for the proscribed purpose. For this reason, we cannot affirm the decision of the Tax Court which is premised upon such a conclusion. Under these circumstances, we feel that a remand for a new trial of the accumulated earnings issue, with particular attention to the question of reasonable business needs, is fairer to both sides than outright affirmance or reversal.

Because the decision on remand may render the issue moot, we do not find it appropriate to decide whether the Tax Court erred in computing the adjustment to income under Section 535(b) (1).

2. *Was the 1957 Payment for Early Delivery Deductible as a Business Expense?*

Taxpayer ordered two oil barges to be delivered in Louisiana in 1957. In the contracts for the construction of the barges, taxpayer agreed to pay a bonus of $200 per barge for each day the barges were delivered prior to the agreed delivery dates. Taxpayer paid the builder a total of $7,000 for the early delivery of the barges and deducted this as an ordinary and necessary business expense for the year 1957. The Commissioner asserts, and the Tax Court held, that the payment is part of the purchase price and, therefore, is a capital expenditure

to be recovered through depreciation over the useful life of the asset.

■ We affirm this portion of the decision of the Tax Court. Under Reg. § 1.263(a)–2(a), one form of capital expenditure is "the cost of acquisition * * * of * * * property having a useful life substantially beyond the taxable year." The $7,000 payment was part of the "cost of acquisition" of the two barges. Taxpayer was willing to pay more for the two barges if they were delivered early, and it did in fact do so.

■ Taxpayer maintains that unlike the cost of perfecting title to property or of paying architect's fees or of altering the plans for property being constructed, see Reg. § 1.263(a)–2(c), (d); Driscoll v. Commissioner of Internal Revenue, 147 F.2d 493, 494 (5th Cir. 1945), the utility of the expenditure for early delivery is confined to the year of payment. We agree that in many instances involving non-repetitive expenditures, the test for whether an item should be treated as a current expense or as a capital expenditure is whether the utility of the expenditure survives the accounting period. See Note, Income Tax Accounting: Business Expense or Capital Outlay, 47 Harv.L. Rev. 669 (1934). But we are not certain that the utility of the early delivery payment here was confined to the year 1957; and we are mindful of the possibility that if we hold early delivery payments to be current expenses, purchasers of capital assets in the future will be tempted to distort their income statements by improper allocation between "purchase price" and "early delivery payments."

Neither Atwater Kent Mfg. Co. v. Commissioner, 43 F.2d 331 (3 Cir. 1930), nor Frank & Seder Co. v. Commissioner of Internal Revenue, 44 F.2d 147 (3 Cir. 1930), on which taxpayer relies, is at all persuasive. In every real sense a bonus for early delivery is part of the initial price. As the Commissioner points out, such a conclusion is consistent with the treatment accorded discounts paid for late delivery, Socony Mobil Oil Co. v. United States, 287 F.2d 910 (Ct.Cl.1961), and

with the treatment of the bonus in the hands of the contractor, Evansville Courier v. Commissioner of Internal Revenue, 62 F.2d 232 (7 Cir. 1932). It is also consistent with the treatment of expenses associated with the purchase of property, such as commissions, attorneys' fees, escrow fees, title fees, and the like. Furthermore, the reasoning in the two 1930 Third Circuit cases appears to be that depreciation for the applicable tax year equalled the bonus paid, which may be true, but is quite another matter.

We also find support for our conclusion that early delivery payments should be capitalized in two decisions by the Board of Tax Appeals. W. P. Brown & Sons Lumber Co., 26 B.T.A. 1192(1932); Robert Buedingen, 6 B.T.A. 335 (1927).

3. *From What Date Is a Deduction for Depreciation Allowable on the Barge Which Was Frozen in Until May 1958?*

The final issue concerns the timing of depreciation on a barge delivered by the builder in Louisiana some time in the fall of 1957, towed to Rome, New York (taxpayer's headquarters) for final outfitting, and not put into actual use until May 1958, when the ice in the canal melted.

The Tax Court found that the useful life of the barge for depreciation purposes began when it was put into use, in May 1958. Taxpayer argues that the period should begin as of December 1, 1957, by which time the barge was ready for service.

We agree with the taxpayer. By December 1957, the barge had been in Rome since an undisclosed date in the fall. As the Tax Court found, the final outfitting of the barge was done in Rome. The Tax Court made no finding as to when this outfitting was completed, but it is fair to infer that it had been finished by the start of December.

If this is so, the barge was ready for charter or for use in taxpayer's own distribution business by December 1, 1957, but could not be used until May 1958, because it was frozen into the water of an upstate canal. This was certainly not a condition which the taxpayer desired to bring about. Instead of earning money or carrying oil, the barge, although ready for use, "stayed in the canal subject to the weather elements all winter," in the words of taxpayer's president. It seems only proper, in order to reflect the gradual deterioration of the completed asset that was taking place during this period, that part of the cost of the asset be allocated as a depreciation deduction to December 1957 and the remaining months of the winter of 1957–1958.

This result accords with the language of Section 167 of the Code ("a reasonable allowance for the exhaustion, [and] wear and tear * * * of property used in the trade or business * * *"), if not with the literal language of Regulation Section 1.167(a)–10(b) ("the period for depreciation of an asset shall begin when the asset is placed in service * * *"). It is also consistent with the numerous cases holding that depreciation may be taken when depreciable property is available for use "should the occasion arise," even if the property is not in fact in use. P. Dougherty v. Commissioner of Internal Revenue, 159 F.2d 269 (4th Cir. 1946); Kittredge v. Commissioner of Internal Revenue, 88 F.2d 632 (2d Cir. 1937); Otis Beall Kent, 12 CCH Tax Ct.Mem. 1491 (1953) (farm structures completed but not used in the year for which depreciation deduction taken); George S. Jephson, 37 B.T.A. 1117 (1938) (rental property ready for rent but not rented in the year for which depreciation deduction taken). The cases cited by the Commissioner, including Nulex, Inc., 30 T.C. 769 (1958), and Hillcone S.S. Co., 22 CCH Tax Ct.Mem. 1096, 1110 (1963), can be distinguished on the grounds that in those cases the taxpayer was not yet in the business for which the depreciable assets had been purchased.

Reversed in part, reversed and remanded in part, and affirmed in part.