CONNECTICUT YANKEE ATOMIC
POWER COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 93–341T.

United States Court of Federal Claims.

Sept. 17, 1997.

Herbert N. Beller, Washington, DC, attorney of record for plaintiff. William C. Edgar and Bryan Cave, L.L.P., of counsel.

G. Robson Stewart, Department of Justice, Washington, DC, with whom was Assistant Attorney General Loretta C. Argrett, for defendant. David Gustafson and Steven I. Frahm, of counsel.

## OPINION

FUTEY, Judge.

This tax case is before the court on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. Plaintiff maintains that it is entitled to take a depreciation deduction and an investment tax credit (ITC) for certain nuclear fuel assemblies in 1985, the year plaintiff received the fuel assemblies from the manufacturer. Defendant argues that plaintiff cannot take either the depreciation deduction or the ITC until 1986, the year the fuel assemblies were installed into the reactor. Defendant also asserts that: (1) plaintiff's method of accounting does not clearly reflect income; and (2) plaintiff changed its method of accounting without securing the prior approval of the Commissioner for the Internal Revenue Service.

### Factual Background [1]

Plaintiff is a Connecticut public service company which owns and operates a 582,000 kilowatt, single-unit nuclear electric generating plant in Haddan Neck, Connecticut. The nuclear fuel used in plaintiff's reactor is contained in fuel assemblies. These fuel assemblies, along with other components, form the reactor core, which produces heat that generates electricity. Plaintiff's reactor contains 157 fuel assemblies and needs to be periodically refueled. This periodic refueling ensures that the core maintains its peak efficiency and sustains the nuclear reaction that causes the production of nuclear power.

Each refueling of plaintiff's reactor necessitates replacing approximately one-third of the existing fuel assemblies in the reactor core with new fuel assemblies. Specifically, refueling involves: (1) cooling the reactor; (2) gaining access through the top of the reactor; (3) removing the batch of fuel assemblies in need of replacement; (4) shuffling partially burned fuel assemblies into new positions; (5) placing the new fuel assemblies into the reactor; (6) closing off the

---

**1.** The facts are taken from the parties' February 3, 1997, joint stipulation of facts.

top of the reactor; (7) conducting Nuclear Regulatory Commission required testing; and (8) resuming operation. The period during refueling is called a "refueling outage."

The period between refueling outages is called an "operating cycle" and usually lasts between twelve and eighteen months. Plaintiff identifies these operating cycles with a sequential designation, which commenced when the reactor was initially placed into service. For example, Cycle 1 refers to the first cycle of operation, and Cycle 2 refers to the cycle following the initial refueling.

On August 21, 1984, during the refueling outage of the reactor prior to Cycle 13, the reactor cavity seal ring failed while the reactor cavity was being flooded in preparation for refueling. This caused 200,000 gallons of slightly radioactive borated water to spill onto the floor of plaintiff's Containment Building. The repairs necessitated by the spill extended the outage period and delayed the commencement of Cycle 13 by approximately five weeks, to November 9, 1984.

Also, during Cycle 13, plaintiff tested four specially formulated fuel assemblies that had zircalloy fuel rod cladding, as opposed to stainless steel cladding. In anticipation that the zircalloy assemblies might not be used, plaintiff opted to have four additional stainless steel fuel assemblies on hand at the plant for use, if necessary, as back-ups in completing the batch for Cycle 13. These back up assemblies were designated S01–S04.[2] The four zircalloy assemblies were, in fact, used in Cycle 13, with the result that S01–S04 were not used in that cycle.

Even before the commencement of Cycle 13, on August 6, 1984, plaintiff ordered 48 stainless steel clad fuel assemblies for delivery to the plant site during July and August of 1985. These assemblies, designated S05–

S52, together with S01–S04, were to comprise the full batch of fuel assemblies (Batch 16 Assemblies) to be used for Cycle 14. At the time these assemblies were ordered, the outage refueling was scheduled to start on October 1, 1985. Further, Cycle 14 was scheduled to commence on December 1, 1985.

As of August 13, 1985, all the Batch 16 Assemblies were delivered to plaintiff's plant. During the inspection process, certain problems were discovered with the "mixing veins" on some of the delivered assemblies.[3] The correction of these problems, along with other necessary inspection and testing, was completed by December 4, 1985; however, the reactor was not shut down for the outage preceding Cycle 14 until January 4, 1986.[4]

On February 26, 1986, while the upper reactor internals were being moved, a single fuel assembly was inadvertently dropped. Due to the dropping of the assembly, all the fuel assemblies in the reactor during Cycle 13 were removed from the core and inspected for additional damage. Inspection and fuel re-loading for Cycle 14 was completed in March 1986, and on May 10, 1986, Cycle 14 commenced operation.

Plaintiff, as a public utility, is subject to regulation by the Federal Energy Regulatory Commission (FERC). It must utilize the FERC Uniform System of Accounts on financial statements and other financial reports which plaintiff must submit to FERC. Pursuant to FERC accounting procedures, the depreciation of the cost of nuclear fuel assemblies, as current operating expenses, cannot commence until the assemblies are inserted into the reactor and power generation begins. This method of depreciation, called the "burnup" method, is based on an estimate of the amount of kilowatt-hours of energy produced by the amount of nuclear fuel burned during the period involved.

2. S01 and S02 were delivered to plaintiff in May 1984. Plaintiff originally ordered these assemblies as potential back-ups for regular stainless steel assemblies that might be damaged or unusable in Cycle 13. S03 and S04 were delivered to plaintiff in August 1984. Plaintiff ordered these assemblies as early back-ups for the zircalloy assemblies. The manufacturer of the assemblies agreed not to invoice plaintiff for S03 and S04 until they were inserted into the reactor.

3. The parties do not define the term "mixing vein."

4. This outage could have commenced in mid-November 1985. The timing of that outage, however, would have coincided with the outage of another nearby reactor, which was undesirable from a load management standpoint in view of the heavy energy demands that typically exist during the month of December.

Prior to 1979, plaintiff used the burnup method of depreciation for federal income tax purposes. In 1979, plaintiff elected to depreciate fuel assemblies for tax purposes over a five-year life prescribed by the "Class Life Asset Depreciation Range" (ADR) rules of the Internal Revenue Code (Code). *See* I.R.C. § 167.[5] Further, in 1981, plaintiff depreciated fuel assemblies for tax purposes over a five-year life pursuant to the "Accelerated Cost Recovery System" (ACRS) rules of the Code. *See* I.R.C. §§ 167, 168.

On its original 1985 federal income tax return, plaintiff treated the 48 fuel assemblies delivered to the plant in August 1985 as being "placed in service" in 1985 for depreciation and ITC purposes. Accordingly, plaintiff claimed a depreciation deduction for those assemblies of $4,908,760 and ITC of $3,402,633.[6]

Following an audit of plaintiff's 1985 return, defendant issued a report, dated June 16, 1989, proposing various adjustments. Plaintiff agreed to all the proposed adjustments except to defendant's finding regarding the 48 fuel assemblies comprising the bulk of the Batch 16 Assemblies.[7] Specifically, plaintiff disagreed with defendant's recommended adjustment that no depreciation or ITC was allowable for the assemblies in that taxable year because the assemblies were not placed into service in 1985.

Plaintiff filed a written protest with defendant; however, no settlement was ever reached. On September 29, 1992, plaintiff filed an amended corporate federal income tax return (First Refund Claim) seeking a refund of $5,660,663 for 1985. This claim was based upon the disallowed depreciation deduction and the ITC claimed for the 48 fuel assemblies delivered to the plant in August of 1985. On December 30, 1992, defendant denied the First Refund Claim in its entirety. On March 5, 1993, plaintiff filed a second amended corporate federal income tax return (Second Refund Claim) for 1985,

seeking an additional tax refund of $513,112 relating to the back-up assemblies. On April 27, 1993, defendant denied the Second Refund Claim in its entirety. Plaintiff paid all the assessed additional tax and interest relating to the instant dispute on July 23, 1992.

On May 28, 1993, plaintiff filed suit in this court contending that it is entitled to a depreciation deduction and ITC in 1985 deriving from the Batch 16 Assemblies. On February 13, 1997, plaintiff filed its motion for summary judgment maintaining that, in compliance with the Code and the Treasury Regulations (Regulations), the Batch 16 Assemblies were "ready and available" for use in 1985. On March 17, 1997, defendant filed its cross-motion for summary judgment, arguing that: (1) plaintiff's method of accounting for the fuel assemblies does not clearly reflect income; (2) plaintiff improperly changed its method of accounting; and (3) the Batch 16 Assemblies were placed in service in 1986, the year the assemblies were inserted into the reactor and became operational. On July 9, 1997, the court heard oral argument on the parties' motions.

*Discussion*

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed. Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden

---

5. All statutory references are to the Internal Revenue Code of 1954, as amended, and as in effect during the taxable years of relevance in this case.

6. For purposes of FERC, plaintiff did not take a depreciation deduction for the Batch 16 Assemblies until 1986, the year the fuel assemblies

were inserted into the reactor and began to generate electricity.

7. Plaintiff did not claim any depreciation or ITC with respect to the back-up assemblies (SO1–S04).

then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54. The court must resolve any doubts about factual issues in favor of the non-moving party, *Litton Industrial Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir. 1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). Summary judgment will not necessarily be granted to one party or another simply because both parties have moved for summary judgment. *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc., v. United States,* 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman,* 26 Cl.Ct. at 1014).

■ In the present case, defendant first argues that, because plaintiff "claim[s] tax benefits for the cost of property, whose function is to produce electricity, in a year prior to the year which it is actually used to produce electricity, and income, plaintiff mismatches associated expenses and income in time."[8] In this regard, defendant maintains that, until the Batch 16 Assemblies are used in the reactor to produce heat, thereby contributing to the generation of electricity, they do not contribute to the production of income. Thus, defendant contends that the depreciation deduction and ITC derived therefrom, do not clearly reflect income. Plaintiff asserts that, because its method of depreciation is explicitly prescribed by the Code and the Regulations, the "ready and available" principle necessarily satisfies the "clear reflection of income" requirement.

A taxpayer's choice of accounting methods is governed by I.R.C. § 446 (1982). That statute provides, in pertinent part:

(a) General rule

Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) Exceptions

If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

*Id.* Further, the Regulation interpreting that statute states, with regard to a taxpayer's choice of accounting method:

[N]o method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income. A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expenses are treated consistently from year to year.

Treas. Reg. § 1.446–1(a)(2) (1985).

■ The taxpayer possesses the initial discretion to determine what method of accounting it will utilize which, in its view,

8. Defendant's Cross–Motion for Summary Judgment at 15.

clearly reflects income. *Mulholland v. United States*, 28 Fed.Cl. 320, 334 (1993), *aff'd*, 22 F.3d 1105 (Fed.Cir.1994). "[T]he Commissioner then has the authority, under § 446(b) of the Code, to review the taxpayer's choice of method to determine whether said method in fact clearly reflects the taxpayer's income." *Id.* The taxpayer's threshold selection is subject to a *de novo* review by the court. *Id.* The court's review of the Commissioner's determination, however, is much more limited. *Id.* at 335. The Commissioner has broad discretion to determine whether a particular method of accounting clearly reflects income. *Hughes Properties, Inc. v. United States*, 5 Cl.Ct. 641, 646 (1984), *aff'd*, 760 F.2d 1292 (Fed.Cir.1985), *aff'd*, 476 U.S. 593, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986). That determination is entitled to more than the usual presumption of correctness and " 'should not be interfered with unless clearly unlawful.' " *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532, 99 S.Ct. 773, 781, 58 L.Ed.2d 785 (1979) (quoting *Lucas v. American Code Co.*, 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930)). The taxpayer bears the heavy burden of showing that the Commissioner's determination is plainly arbitrary. *Id.* at 532–33, 99 S.Ct. at 780–82.

In the case at bar, the Commissioner has made no administrative determination with regard to the method of accounting chosen by plaintiff. Therefore, the court reviews plaintiff's initial threshold selection *de novo* to determine whether plaintiff's method of accounting clearly reflects income. *Mulholland*, 28 Fed. Cl. at 334. Plaintiff has utilized I.R.C. §§ 167 and 168 to depreciate fuel assemblies since 1981. Moreover, defendant conceded at oral argument that plaintiff properly utilized the appropriate depreciation methods with regard to the subject assemblies.[9] With regard to a taxpayer's choice of accounting method, in *Hallmark Cards, Inc. v. Commissioner*, 90 T.C. 26, 31, 1988 WL 64 (1988), the Tax Court has stated:

> [The Commissioner's] broad authority to determine whether a taxpayer's accounting method clearly reflects income is limited,

in that he may not reject, as not providing a clear reflection of income, a method of accounting employed by the taxpayer which is specifically authorized in the Code or regulations and has been applied on a consistent basis.

*See also Hewlett–Packard Co. v. United States*, 71 F.3d 398, 403 (Fed.Cir.1995) (the Commissioner's broad discretion to require a particular method of accounting is not unlimited). Thus, because plaintiff's method of depreciation is explicitly provided for by the Code, and plaintiff has consistently employed that method since 1981, plaintiff's method of depreciation "clearly reflects income."

■ Defendant next argues that plaintiff improperly changed its accounting procedures without the prior consent of the Commissioner. In this regard, defendant maintains that plaintiff must continue to utilize the burnup method for determining depreciation and ITC. Plaintiff maintains that it did not need the Commissioner's consent because the applicable Code section "itself and the underlying regulations make clear that the Commissioner's prior approval of a method change is not required if another Internal Revenue Code provision or regulation expressly so provides."[10] In this regard, plaintiff asserts that the cases cited by defendant are inapposite "for each of those cases involved an attempt to change a previously claimed tax accounting treatment with respect to *existing* items for which expenditures had already been made. [Plaintiff], on the other hand, made no change with respect to existing fuel assemblies for which depreciation was already being claimed under the burn-up or ADR methods."[11]

The Code states, in part:

> Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary.

---

9. Transcript at 23–24(Tr.).

10. Pl.'s Reply at 6.

11. *Id.* at 9.

I.R.C. § 446(e). Further, the Regulation interpreting that statute provides:

> Except as otherwise expressly provided in chapter 1 of the Code and regulations thereunder, a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his taxable income under the new method for purposes of taxation, secure the consent of the Commissioner. Consent must be secured whether or not such method is proper or is permitted under the Internal Revenue Code or the regulations thereunder.
>
> *  *  *  *  *  *
>
> A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan.
>
> *  *  *  *  *  *
>
> A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction.

Treas. Reg. § 1.446–1(e)(2).

■ The purpose of the consent requirement is to enable the Commissioner to prevent distortions of net income that often accompany changes in accounting methods. *Hackensack Water Co. v. United States,* 173 Ct.Cl. 606, 352 F.2d 807, 810 (1965); *see also Woodward Iron Co. v. United States,* 396 F.2d 552, 554 (5th Cir.1968). "[T]he Commissioner is empowered to prevent such distortion and consequential windfall to the taxpayer by conditioning his consent on the taxpayer's acceptance of adjustments that would eliminate any distortion." *Woodward,* 396 F.2d at 554.

In *Diebold, Inc. v. United States,* 891 F.2d 1579, 1581 (Fed.Cir.1989), the taxpayer historically treated certain replacement parts as inventory, and then sought, by way of amended returns, to treat them as depreciable assets without first requesting the consent of the Commissioner. The United States Court of Appeals for the Federal Circuit, however, held that the taxpayer was required to obtain the Commissioner's consent when it changed its method of accounting. *Id.* at 1583. Moreover, the Federal Circuit found that "Section 446(e) prohibits taxpayers from unilaterally amending their tax returns simply because they have discovered that a different method of accounting yields a lower tax liability than the method they originally chose." *Id.*

■ *Diebold* is distinguishable from the case at bar. In *Diebold,* the taxpayer sought to re-characterize certain existing assets in order to gain a tax advantage. *Id.* at 1581. In the present case, however, plaintiff has not sought to re-characterize the tax treatment of any existing assets, but rather, is seeking to apply a particular method of depreciation on newly acquired assets in compliance with the Code. In this regard, the legislative history of the Economic Recovery Tax Act of 1981 supports plaintiff's position. In particular, the Joint Committee on Taxation Report states, in pertinent part:

> *ACRS is mandatory for all eligible property.* The recovery allowance provided under section 168 is deemed a reasonable allowance for depreciation under section 167(a), and eligible property may not be depreciated under the prior law rules of section 167.

General Explanation of the Economic Recovery Tax Act of 1981, H.R. 4242, Pub.L. 97–34, 76 (1981) (emphasis added); *see also Liddle v. Commissioner,* 65 F.3d 329, 333 (3rd Cir. 1995) (ACRS is mandatory and must be used for recovery property placed in service after 1980 and before 1987); *Simon v. Commissioner,* 103 T.C. 247, 255, 1994 WL 450480 (1994) (same), *aff'd,* 68 F.3d 41 (2nd Cir. 1995); *Sprint Corp. v. Commissioner,* No. 13159–94, 1997 WL 211306, at *13 (April 30, 1997) (same).[12] Moreover, § 446(e) "is not applicable where the law specifically prescribes or proscribes a method of accounting or computation; the general requirement of consent to change yields before the more specific commands of the law." *North Carolina Granite Corp. v. Commissioner,* 43 T.C. 149, 168, 1964 WL 1160 (1964). Thus, because plaintiff was required to utilize the

12. The Code defines recovery property as: "tangible property of a character subject to the allowance for depreciation ... used in a trade or business." I.R.C. § 168(c) (1982).

ACRS method of depreciation with regard to the Batch 16 Assemblies, plaintiff was not required to seek the consent of the Commissioner.[13]

■ Finally, the parties dispute the year in which plaintiff is entitled to a depreciation deduction and ITC for the Batch 16 Assemblies. Plaintiff maintains that it is entitled to take the deduction in 1985, the year the fuel assemblies were received from the manufacturer and were "ready and available" for use. Defendant asserts that the assemblies were not "ready and available" until 1986, the year the assemblies were inserted into the reactor.

The Code provides that "[t]here shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) ... of property in a trade or business." I.R.C. § 167(a) (1982). Depreciation deductions are governed by Treas. Reg. § 1.167(a)–10(b) (1985), which states: "The period for depreciation of an asset shall begin when the asset is placed in service and shall end when the asset is retired from service." Further, the Regulations define when property is "placed in service":

> Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity or in a personal activity.

Treas. Reg. § 1.67(a)11(e)(1)(i). This regulation also states that the provisions of § 1.46–3(d) regarding the ITC applies to depreciation for the purpose of determining the date on which property is placed in service. *Id.* The regulation applicable to the ITC states:

> (1) For purposes of the credit allowed by Section 38, property shall be considered placed in service in the earlier of the following taxable years:

**13.** Defendant also maintains that the court should give deference to the accounting methods mandated by FERC and cites *Morgan Guar. Trust Co. v. United States*, 218 Ct.Cl. 57, 585 F.2d 988 (1978). The court in *Morgan* noted that "when reviewing tax accounting questions, deference should be paid to accounting methods which a regulatory body or agency imposes upon a business or enterprise." *Id.* at 997 (citing *Commis-*

> (i) The taxable year in which, under the taxpayer's depreciation practice, the period of depreciation with respect to such property begins; or

> (ii) The taxable year in which the property is placed in a condition or state of readiness and availability for specifically assigned function, whether in a trade or business, in the production of income in a tax-exempt activity, or in a personal activity.

Treas. Reg. § 1.46–3(d) (1985). Section (2) of § 1.46–3(d) gives examples of property that shall be considered "ready and available" under the statute:

> (2) In the case of property acquired by a taxpayer for use in his trade or business (or in the production of income), the following are examples of cases where property shall be considered in a condition or state of readiness and availability for a specifically assigned function:

> > (i) Parts are acquired and set aside during the taxable year for use as replacements for a particular machine (or machines) in order to avoid operational time loss.

> > (ii) Operational farm equipment is acquired during the taxable year and is not practicable to use such equipment for its specifically assigned function in the taxpayer's business of farming until the following year.

> > (iii) Equipment is acquired for a specifically assigned function and is operational but is undergoing testing to eliminate any defects.

Treas. Reg. § 1.46–3(d)(2).

■ "The 'ready and available' standard expressed in the regulations contemplates that property will qualify for [depreciation and] the ITC at a time before it is actually used." *Northern States Power Co. v. United States*, 952 F.Supp. 1346, 1352 (D.Minn.1997),

*sioner v. Idaho Power Co.*, 418 U.S. 1, 15, 94 S.Ct. 2757, 2765–66, 41 L.Ed.2d 535 (1974)). In the present case, however, as discussed above, plaintiff was required to utilize the ACRS method of depreciation with regard to the Batch 16 Assemblies. It is therefore axiomatic that plaintiff could not utilize the FERC-required burnup method of accounting for federal income tax purposes.

*appeal and cross-appeal docketed,* Nos. 97–2914, 97–2915 (8th Cir. July 16, 1997). "For an asset to be 'placed in service' for purposes of depreciation and the [ITC], it is not necessary that the property actually be used during the taxable year in the taxpayer's profit motivated venture." *Waddell v. Commissioner,* 86 T.C. 848, 897, 1986 WL 22124 (1986), *aff'd,* 841 F.2d 264 (9th Cir.1988); *see also Hudson v. Commissioner,* 103 T.C. 90, 106, 1994 WL 388975 (1994), *aff'd,* 71 F.3d 877 (5th Cir.1995).

■ Rather, the "placed in service" requirement is satisfied when an asset is in a state of readiness and availability for a specifically assigned function in a trade or business. *See* Treas. Reg. § 1.67(a)–11(e)(1)(i). Thus, "depreciation may be taken when depreciable property is available for use 'should the occasion arise,' even if the property is not in fact in use." *Sears Oil Co. v. Commissioner,* 359 F.2d 191, 198 (2nd Cir.1966) (citations omitted).

In the present case, the Batch 16 Assemblies were "ready and available" in December 1985. At that time, all necessary and required testing was complete and the assemblies were available, should the occasion arise, for insertion into the reactor. It was only due to the accidental spilling of slightly radioactive borated water in August 1984 and plaintiff's concerns regarding the heavy energy demands that typically exist in the month of December that prevented plaintiff from commencing the refueling outage preceding Cycle 14 until January 1986. Thus, the assemblies were in a state of readiness and available for their specifically assigned function in 1985.

The court's conclusion is consistent with a number of other cases considering whether an asset is "ready and available" for service prior to the actual use of the asset. In *Northern States Power,* 952 F.Supp. at 1346, a factually identical case to the one at bar, the taxpayer purchased forty nuclear fuel assemblies in 1985, that were installed·in the taxpayer's reactor in 1986, and forty-four nuclear fuel assemblies in 1986, that were installed in the taxpayer's reactor in 1987. The taxpayer claimed that the fuel assemblies were placed in service and, thus, enti-

tled to a depreciation deduction, when purchased and delivered. The court in *Northern States Power* found that the Regulations "make clear that the taxpayer need not wait until the property is actually used." *Id.* at 1352. Moreover, the court held that, because the fuel assemblies were fully assembled, inspected, tested and available to be placed into the reactor core, the fuel assemblies were "ready and available" at the time the taxpayer acquired them in their fully assembled form. *Id.* at 1354.

In *SMC Corp. v. United States,* 675 F.2d 113 (6th Cir.1982), the taxpayer purchased equipment in 1975 but was unable to use it in that year due to a lack of electricity which was beyond the taxpayer's control. The court in *SMC* concluded that, because the property was fully operational except for the connection of electricity, the equipment was placed in service in 1975, the year it was purchased. *Id.* at 114.

In *Schrader v. Commissioner,* 34 T.C.M. (CCH) 1572 (1975), *aff'd,* 582 F.2d 1374 (6th Cir.1978), the taxpayer installed an air conditioner in its coin laundry business in September 1960 but did not use it until warm weather arrived in May 1961. The Tax Court found that the air conditioner was placed in service when it was installed, in September 1960. *Id.* at 1577.

In *Sears Oil Co. v. Commissioner,* 359 F.2d 191 (2nd Cir.1966), the taxpayer purchased a barge in the fall of 1957 but, because of ice on the canal where the barge was located, was unable to use it until May 1958. The court found that, because the taxpayer did not choose to have the barge stuck in the ice, and the barge was deteriorating during the months of inactivity, the barge was placed in service in 1957. *Id.* at 198. Moreover, the court stated that the barge was ready for use, "should the occasion arise," in December 1957, and thus, the taxpayer was entitled to a depreciation deduction from that time. *Id.*

In *Giles v. Commissioner,* 50 T.C.M. (CCH) 1342 (1985), the taxpayer purchased an automobile in December 1979, but did not use it until January 1980 because he was on vacation. The Tax Court held that the auto-

mobile was operational, and thus placed in service, when it was acquired in 1979. *Id.* at 1344.

The common thread among these cases is that property acquired on one date but not actually utilized until a later date may qualify for a depreciation deduction and ITC on the earlier date. Significantly, each case describes property purchased by the taxpayer in its completed form but not immediately utilized by the taxpayer for assorted reasons. These cases provide support for a similar result to the case at bar.[14]

Defendant, however, asserts that "[t]he key concept of the ready and available test for determining whether property is placed in service is ready and available *for immediate use.*"[15] In this regard, defendant maintains that, although depreciation need not start when the assemblies are in the reactor and producing power, the depreciation should start at "an earlier time, a logical and reasonable time when the assemblies have been placed in the reactor, they have undergone the low power physics testing, and at that time they are ready and available *for immediate* use for their assigned function of producing power."[16]

■■■ The court does not read an "immediacy" requirement into the "ready and available" test. Indeed, the examples provided in the Regulations envision that property acquired on one date but not put into use until

a later date are all entitled to depreciation and ITC commencing on the earlier date. *See* Treas. Reg. § 1.46–3(d)(2). In this regard, the court in *Northern States Power* stated:

> If the position of the [defendant] were adopted, there would be no difference between the date when the property is "ready and available" for use and the date on which it is actually used. The legislation contemplates that the property will be "ready and available" on a date earlier than the date on which it is used.

*Northern States Power*, 952 F.Supp. at 1354. Significantly, that court further stated that "[t]he fact that the testing process is more complex for some property than for other property does not justify applying a different standard to such property." *Id.*

This court finds the analysis in *Northern States Power* compelling and agrees with that court's conclusion. Accordingly, it is not required that the assemblies be ready for "immediate" use in order to be "ready and available" for depreciation and the ITC. Thus, this court concludes that plaintiff is entitled to a depreciation deduction and ITC with regard to the Batch 16 Assemblies in 1985.[17]

### Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment is granted as to liability only, and defendant's cross-motion for summary judgment is denied. The parties are directed to file a stipulation as to the

---

14. Defendant also relies on *Siskiyou Communications, Inc. v. Commissioner*, 60 T.C.M. (CCH) 475 (1990), and *Piggly Wiggly Southern, Inc. v. Commissioner*, 84 T.C. 739, 1985 WL 15341 (1985), *aff'd*, 803 F.2d 1572 (11th Cir.1986). *Siskiyou Communications* dealt with component parts of a power production facility. In the present case, however, the Batch 16 Assemblies are not component parts of the nuclear reactor, but rather, are separate pieces of depreciable property. *See Northern States Power Co. v. United States*, 952 F.Supp. 1346, 1352, 1355 (D.Minn.1997), *appeal and cross-appeal docketed*, Nos. 97–2914, 97–2915 (8th Cir. July 16, 1997). Further, *Piggly Wiggly* dealt with refrigerators that were placed into new and remodeled stores. The court in *Piggly Wiggly*, however, did not deal with assets

that were purchased and not used until a later date in an on-going business.

15. Tr. at 33 (emphasis added).

16. *Id.* at 34 (emphasis added).

17. Defendant further maintains that the court should consider whether the reason for plaintiff's delay in utilizing the fuel assemblies in 1985 was beyond plaintiff's control. Although the courts in *SMC Corp. v. United States*, 675 F.2d 113 (6th Cir.1982), and *Sears Oil Co. v. Commissioner*, 359 F.2d 191 (2nd Cir.1966), considered the reason for the taxpayer's delay in placing the asset in service, neither the Code nor the Regulations require this court to consider such a factor.

amount of refund plaintiff is entitled to by October 16, 1997. Upon receipt of the stipulation, the Clerk is ordered to enter judgment for plaintiff without further order from the court. No costs.