In re HILLSBOROUGH HOLDINGS CORPORATION, et al., n/k/a Walter Industries, Inc., Debtors.

HILLSBOROUGH HOLDINGS CORPORATION, et al., n/k/a Walter Industries, Inc., Plaintiff,

v.

UNITED STATES of America, Defendant.

Bankruptcy Nos. 89–9715–8P1 through 89–9746–8P1.

Adv. No. 91–313.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Sept. 3, 1992.

Don Stichter, Tampa, Fla., and Michael Crames, New York City, for debtor.

Robert Welsh, Carl Carter, Scott Crosby, Trial Atty., Tax Div., Washington, D.C., for defendant.

James O'Donnell, Jacksonville, Fla., for plaintiff.

## ORDER ON CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

ALEXANDER L. PASKAY, Chief Judge.

THESE ARE procedurally consolidated Chapter 11 cases and the matters under consideration are claims set forth in the above-captioned Adversary Proceeding, initiated by a Complaint filed by Hillsborough Holdings Corporation, et al. (Debtors), against the United States of America (Government). In its five-Count Complaint, the Debtors seek a determination of (1) the correct amount of the Debtors' tax liability for the tax years in issue; (2) a determination of whether any claims of the Government have priority or only general unsecured status; (3) a determination whether the Debtors are liable for a penalty based on the alleged underpayment of taxes owed and due to the Government pursuant to 26 U.S.C. § 6661. The Debtors also sought an Order abating the accrual of interest pursuant to 26 U.S.C. § 6404(e) and an award of any attorneys' fees incurred by the Debtors in bringing this action pursuant to 26 U.S.C. § 7430.

Presently under consideration are Cross Motions for Partial Summary Judgment. Both the Debtors and the Government contend that there are no genuine issues of material fact and that they are entitled to judgments in their respective favors as a matter of law regarding the following two threshold issues in calculating the Debtors' tax liability for the years in question: (1) whether the Debtors may use the straight-line or pro-rata method of calculating interest income on the sale of repossessed property and (2) whether the Debtors may reclassify amounts which, when taken to-

gether with the 10% rate of stated interest in certain notes (to be subsequently explained in more detail), reflects what the Debtors considered to be a fair return to Mid–State Homes, Inc. (MSH), a wholly-owned subsidiary of Jim Walter Corporation (JWC), founded in 1958. MSH is one of the Debtors in these Chapter 11 cases and, as will be discussed subsequently in more detail, was the mortgage financing arm of JWC.

A brief review of the pertinent facts, all of which are basically without dispute, will help to put the matters under consideration into proper focus.

The Debtors' predecessor, JWC was incorporated in 1955. Over the years, JWC grew and operated through acquisition of numerous and sundry businesses. Jim Walter Homes (JWH) was one of the several wholly-owned subsidiaries of JWC. It was engaged in manufacturing semi-finished homes.

MSH serviced all mortgages generated by JWH when it sold a semi-finished home to the owner of the land on which the home was erected. The mortgage granted by the purchaser of the home from JWH encumbered the home, lot, and all improvements added to the home by the buyer. The mortgage was to secure the balance due on the total purchase price, and the indebtedness was represented by a promissory note executed by the buyer. As a rule, the mortgages had a maximum twenty-five year term, and secured 100% of the purchase price of the home. The purchase price for the home had the following components: cost of construction, profit, a 10% stated interest and finally, an unstated interest. MSH financed over 97% of all the homes built and sold by JWH. The transactions between JWH and MSH generally followed the following scenario:

At the end of each month, JWH assigned all the notes and mortgages generated from the sales during the month to MSH, which took the mortgages at their face amount, i.e., principal amount of the note less the unstated interest. The unstated interest represented the amount of the adjustments which were necessary to yield what JWH considered to be a fair return to MSH. In all fairness, it should be pointed out that at the time MSH paid approximately 18% interest on funds it borrowed to finance the operation of JWH. As the monthly mortgage payments were collected from the homeowner, a pro-rata amount of the stated interest and the unstated interest using the straight line method of accounting was recognized as income each month for both tax and financial statement purposes during the active life of the mortgage.

In the event there was a default on the mortgage note, MSH reassigned the note and the mortgage to JWH which either repossessed the home or, in States where foreclosure was required, instituted a foreclosure action and reacquired the house, together with the underlying real property. The value of the property JWH recovered was recognized by JWH as the outstanding balance on the note, and placed on the books of JWH as the amount equal to the remaining unpaid balance of the customer installment receivable, less the balance in unearned time charges and unearned interest.

The accounting for the sale of a repossessed house by JWH was essentially the same as for the sale of a new house; that is, (i) a pro-rata or straight line method was used to calculate how much of each payment should be recognized as income, and (ii) reclassification adjustments were made on the books of JWH to provide MSH with what the Debtors considered to be a fair yield on the notes to MSH. In other words, the Debtor reclassified the unstated interest as a deduction from profit. It is without dispute that the net effect of the Debtors' accounting treatment relevant to the sale of repossessed houses is as follows:

(a) No gain or loss is recognized at the time of repossession, and the repossessed property is put in inventory on the books of JWH at an amount equal to the remaining unpaid balance of the customer installment receivable, net of the balances in unearned time charges and unearned

discounts which is the amount of the intercompany receivable.

(b) During the year in which repossession occurs, any balance in the deferred profit account of JWH is recognized for income tax purposes.

The original Jim Walter and all its wholly-owned subsidiaries after Jim Walter incorporated filed consolidated federal income tax returns for several years including fiscal year ended August 31, 1983. Although there were minor additions and deletions, the same basic group of companies continued to file a consolidated federal income tax return for each fiscal year. There is no question that the parent Debtor and all of its subsidiaries are jointly and severally liable for whatever is owed to the Government by any of the entities of the consolidated group.

In addition to the 1983 return, the Debtors also filed consolidated federal income tax returns for the fiscal years ending August 31, 1985, August 31, 1986, and August 31, 1987. There is no doubt that the same two issues regarding the Debtors' method of reporting interest income will continue in the years ending August 31, 1985; August 31, 1986; and August 31, 1987. Likewise, consolidated federal income tax returns were also filed by the Debtors for the fiscal years ending May 31, 1988 (nine months); May 31, 1989; and May 31, 1990.

All tax years after August 31, 1982 are "open" with respect to the Debtors' tax liability, i.e., the statute of limitations has either been extended by the Debtors or has otherwise not yet expired. The examination by the Government of the Debtors' tax returns for each of the subsequent years is in a different phase; (i) field audits are complete as to fiscal years ended August 31, 1983 and 1984; (ii) field audits are still in process as to fiscal years ended August 31, 1985, 1986 and 1987; and (iii) no audits have yet been commenced as to fiscal years ended May 31, 1988 (nine months), 1989, and 1990. The Debtors have been notified orally by the Government that the Government will commence audit of these years in 1992.

The Debtors' right to use an installment method of accounting for income on both new houses and repossessed property is not in dispute. What is in dispute is (1) the Debtors' right to use the straight-line or pro-rata method of calculating interest income on the sale of repossessed property and (2) the Debtor's right to reclassify the unstated interest amount which, when taken together with the 10% rate of stated interest in the note, reflects what the Debtors considered to be a fair return to MSH. The Government contends that the Debtors must use the economic accrual method of calculating interest income on the sale of repossessed property and that the reclassification is impermissible and improper for income tax purposes and is not permitted by I.R.C. § 1502 and the applicable regulations promulgated pursuant to the I.R.C.

In making its determination of proposed adjustments, the Government contends that the following accounting treatment used by the Debtors must be changed.

(a) For MSH, the Debtors must change their method of reporting interest income on the installment notes received from the sale of repossessed homes from the straight line or pro-rata method to the economic accrual method.

(b) For JWH, that the unstated interest on installment receivables subsequent to May 21, 1983 in connection with transactions involving repossessed homes are not permissible (which adjustments affect the returns and allowances, bad debt expense, and loss on resale accounts).

With respect to Debtors' fiscal years ending August 31, 1980; 1983; 1984; 1985; 1986; and 1987, the Government has filed an Amended Proof of Claim in the aggregate amount of $70,749,780 for tax, penalties, and interest through the date of filing.

It should be noted at the outset that the resolution of the first issue, the Debtor's ability to use the straight line or pro-rata method of calculating interest income on repossessed properties, hinges on whether the repossessed properties should be treated as chattels, as urged by the Debtors, or real property, as urged by the Government. It is conceded that if the repossessed prop-

erties are properly considered chattels for tax purposes, the Debtors are entitled to use the straight line method or pro-rata method of accounting. The Government argues that the Debtors must use the economic accrual method of accounting for the interest income generated from the resale of property foreclosed upon. In support of the Government's position, the Government relies on a letter ruling issued in 1983–84, which is not yet effective, and which states that the appropriate method of accounting in this instance is the economic accrual method. The Debtors urge, however, that reliance on the letter ruling is inappropriate for two reasons: 1) it is not yet effective as a binding regulation and, 2) more importantly, it deals with expense deductions and not income.

In support of the proposition that the resale of the repossessed home acquired by the Debtors through foreclosure is the sale of personalty, the Debtors rely on a private letter issued by the Government in 1971. It is without dispute that in 1971, the Debtors requested a private letter ruling regarding the issue, and in the private letter ruling issued by the Government, the Government advised JWH that the original sale of the house to the landowner shall be treated as a sale of personal property. Of course no one can quarrel with this proposition since it is clear that at the time of the original transaction, the Debtors did not own the land and the Debtors simply sold nothing more than a home it manufactured.

It is without dispute that the Debtors' tax returns were repeatedly audited by the Government, and the Government never questioned the method of accounting used by the Debtors until sometime in 1982 when the Government took the position for the first time that the straight line depreciation method was inappropriate and these transactions shall be treated for tax purposes on the economic accrual method. The Debtors claim that because the Government has fully accepted the Debtors' longstanding treatment of these transactions, it is grossly unfair and unjustified now to compel the Debtors to change this accounting method used in reliance on the private letter ruling issued over 30 years ago.

The Debtors admit, as they must, that when a home was reacquired after default of the original purchaser, they not only sold the house but they also sold the underlying land on which the house is built, which they acquired through foreclosure or otherwise. If the transaction is viewed in the abstract, one is hard pressed to accept the proposition that when one sells a home and conveys fee simple title to the land, the sale involves the sale of chattel and not real property, as contended by the Debtors.

However when one considers the transaction in the context of JWH's business, it is clear that JWH was never in the business of selling real estate. Its business was solely to sell semi-finished homes which were erected on land owned by the purchaser. The fact of the matter is that when the home was reacquired by JWH upon default, the acquisition of the land was merely an unwelcome and unintended byproduct arising out of the default of the purchaser. While it is true that in the majority of the instances, upon the reacquisition of the home, JWH acquired not only ownership of the house it built, but also ownership of the land, this should not change the character of the transaction. In fact, there were instances where the homes were actually removed from the land after default.

For the reasons stated above, this Court is satisfied that the Debtor's Motion for Summary Judgment is well taken as to the narrow issue whether the sale of repossessed properties constitutes the sale of chattels or real property, and the Government's position is rejected.

This leaves for consideration issue 2, whether the Debtors may properly reclassify the unstated interest factor. Although there are no disputed facts concerning this, this record is not sufficiently clear nor are the briefs. Therefore, on this issue, this Court defers ruling on this issue pending further oral argument.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Government's Motion For

Summary Judgment is hereby denied in part. It is further

ORDERED, ADJUDGED AND DE-CREED that the Debtor's Motion For Summary Judgment is granted in part, and the Debtors are entitled to a Partial Judgment in their favor determining that their sale of repossessed properties constitutes the sale of chattels. It is further

ORDERED, ADJUDGED AND DE-CREED that further oral argument on the remainder of the Debtors' and Government's Motions For Summary Judgment is hereby scheduled before the undersigned on October 20, 1992 at 1:30 pm in Courtroom A, 4921 Memorial Highway, Tampa, Florida.

DONE AND ORDERED.