In re **HILLSBOROUGH HOLDINGS CORPORATION, et al., Debtors.**

**Hillsborough Holdings Corporation, et al., Plaintiffs,**

v.

**United States of America, Defendant.**

**Bankruptcy No. 8:89–bk–09715–ALP. Adversary No. 8:91–ap–313–ALP.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

June 9, 2010.

Don M. Stichter, Stichter, Riedel, Blain & Prosser, Tampa, FL, James D. O'Donnell, Blackburn & Company, LC, Jacksonville, FL, Scott J. Pashman, Cooley Godward Kronish LLP, New York, NY, for Plaintiffs.

Carol Koehler Ide, Robert L. Welsh, U.S. Department of Justice, Washington, DC, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION REGARDING STRAIGHT–LINE ISSUE AND DISCOUNT ISSUE

ALEXANDER L. PASKAY,
Bankruptcy Judge.

**THIS CASE** came before the Court for an evidentiary hearing in this adversary proceeding.

The Plaintiffs, Hillsborough Holdings Corporation, et al., filed a Third Amended Complaint for Determination of Tax Liability and for Determination of the Validity, Extent, and Priority of Liens. (Doc. 205). The Plaintiffs and the Defendant, the United States of America, agree that two issues remain for consideration pursuant to the Third Amended Complaint. According to the parties, the issues relate to:

(1) Plaintiffs' reporting of interest income on a straight-line basis (the "StraightLine Issue") with respect to installment notes received from the sale of foreclosed, repossessed, or otherwise reacquired homes (hereinafter referred to as "Reacquired Homes" or "Reacquired Property"); and

(2) Plaintiffs' reclassifying a portion of the amount financed, as stated in the buyers' sales contracts, as "unstated interest" by way of a "discount" ... and Mid–State Homes, Inc. ("MSH") taking the "unstated interest" into income over the life of the note (the "Discount Issue").

(Parties' Joint Stipulation of Facts and Exhibits, Doc. 391, ¶ 1). The Court has considered the evidence presented regarding the two issues identified by the parties, and enters these findings of fact and conclusions of law.

### Table of Contents

Background............................................................322

I.   The Straight–Line Issue ..........................................323
     A.   The Defendant is not precluded from litigating the Straight–Line
          Issue.......................................................324
     B.   The Internal Revenue Code grants the Commissioner broad
          discretion to determine whether a method of accounting clearly
          reflects income ...........................................325
          1.   The Defendant's rejection of the Straight–Line method is not
               clearly unlawful or plainly arbitrary..................327
          2.   The Defendant is not bound by the Plaintiffs' use of the
               Straight–Line method in other years....................329

II.  The Discount Issue...............................................329
     A.   The Defendant is not precluded from litigating the Discount Issue.....330
     B.   The discount reflects the economic substance of the sales............331
          1.   The Notes represent high risk loans ...................333
          2.   The interest rate stated in the Notes is below market ...........334

Conclusion.............................................................335

## Background

From 1991 to 1995, Jim Walter Homes, Inc. (JWH) and Mid–State Homes, Inc. (MSH) were wholly-owned subsidiaries of the Plaintiff, Hillsborough Holdings Corporation. (Stipulation, ¶ 12).

JWH was in the business of marketing and supervising the construction of single-family homes. (Stipulation, ¶ 13). Its sales efforts were concentrated on the low to moderately priced segment of the housing market, and it built the homes on lots that were owned by its customers. (Stipulation, ¶¶ 14, 16). Typically, JWH provided the financing for the purchase of the home, and the customer executed an installment sales contract, a recourse promissory note, and a mortgage, deed of trust, or similar instrument. (Stipulation, ¶ 17).

At the end of each month, JWH transferred all of the sales contracts, notes, mortgages, and related instruments generated during that month to MSH, and MSH serviced the mortgages. (Stipulation, ¶¶ 26, 27). In most cases, MSH immediately transferred the notes and mortgages to a business trust (Mid–State Trust) formed by MSH. (Stipulation, ¶¶ 29, 31).

If a customer defaulted under the note and mortgage, the Mid–State Trust instituted foreclosure proceedings, and the property that was ultimately reacquired (including the land underlying the home) was held in the name of the Mid–State Trust. (Stipulation, ¶¶ 36, 37). A ten percent interest in the foreclosed property was transferred to JWH, however, and JWH was responsible for refurbishing, marketing, and reselling the Reacquired Property. (Stipulation, ¶¶ 37, 38).

When a Reacquired Home was sold to a new customer, the purchaser typically made a modest down payment and executed a sales contract, note for the balance of the purchase price, and mortgage on the home and land. (Stipulation, ¶¶ 40, 41). The sales contracts executed in connection with the sales of the Reacquired Homes contained a ten percent (10%) stated finance charge. The rate did not change based on the credit rating of the customer. (Stipulation, ¶ 42).

For accounting purposes, MSH recognized income or loss on the sale of a Reacquired Home when title was transferred to the customer. (Stipulation, ¶ 48).

For federal income tax purposes, the sales were reported as either "sales" by JWH or as an offset to "bad debts" by MSH. In either case, the amount reported equaled the amount stated as financed in the contract plus the down payment, offset by certain "discounts" associated with the installment sales contracts. (Stipulation, ¶ 49). According to the Plaintiffs, the discounts were applied to enable JWH or MSH to achieve a market rate of return on the financing package, and were derived by multiplying a discount percentage by the stated amount financed in the contract. (Stipulation, ¶ 28).

For the 1991 through 1995 tax years, MSH reported interest income from the finance charge stated in the contracts (10%) on the straight-line method for both tax and financial statement purposes. (Stipulation, ¶ 55). MSH also reported the amortization of the discounts over the life of the contracts as additional interest income in its financial statements and on its income tax returns. This discount, which is described as an "unstated finance charge," was also reported on the straight-line method for both tax and internal accounting purposes. (Stipulation, ¶¶ 52, 55).

In 1998, the Plaintiffs filed a Third Amended Complaint for Determination of Tax Liability. (Docs.205, 210). In para-

graph 27(i) of the Third Amended Complaint, the Plaintiffs allege that the Defendant had issued certain reports setting forth proposed adjustments to the Plaintiffs' tax liability, and that the proposed adjustments are erroneous as follows:

(i) For Mid–State Homes, in determining that Plaintiff must retroactively change its historically authorized, previously approved, and legally acceptable method of reporting interest income on the installment notes received from the sale of repossessed homes on the straight-line method to the economic accrual method, which results in a substantial acceleration in the recognition of income.

(Doc. 205, ¶ 27(i)). See also Doc. 205, ¶ 28(i). The parties have identified the matters raised in paragraph 27(i) of the Third Amended Complaint as the Straight–Line Issue.

Additionally, the Plaintiffs allege in paragraphs 27(e) and (h) of the Third Amended Complaint that other proposed adjustments issued by the IRS are erroneous as follows:

(e) For Jim Walters Homes, Inc., in determining that the discounts on installment receivables from sale of repossessed homes sold to Mid–State Homes are not permissible (which adjustments affect the returns and allowances, bad debt expense, and loss on resale accounts).

. . .

(h) For Mid–State Homes, in determining that it did not properly account for the discounts on installment receivables.

(Doc. 205, ¶¶ 27(e), (h)). See also Doc. 205, ¶¶ 28(e), (h). The parties have identified the matters raised in paragraphs 28(e) and (h) of the Third Amended Complaint as the Discount Issue.

The parties have stipulated that the Straight–Line Issue and the Discount Issue are both "timing issues" that concern "when income is required to be recognized for income tax purposes." The parties have also stipulated that both issues involve the "accounting treatment for the sale of Reacquired Homes," and that both issues relate to the "taxable years 1991, 1992, 1993, 1994, and through the date of Plaintiffs' discharge in bankruptcy on March 17, 1995." (Stipulation, ¶¶ 2, 3, 5).

According to the IRS, the amount of the gross adjustments involved in the Straight–Line Issue is $14,205,023.00, and the amount of the gross adjustments involved in the Discount Issue is $45,329,758.00. (Stipulation, ¶¶ 6, 8).

## I. The Straight–Line Issue

For the years at issue, the parties stipulated that the Plaintiffs reported interest income for (1) the stated finance charge of 10% as set forth in the sale documents, and also for (2) the "unstated finance charge" or "discount" calculated by the Plaintiffs. As to both categories of charges, the interest income was reported on the straight-line method in the Plaintiffs' federal income tax returns, and also in the Plaintiffs' financial statements. (Stipulation, ¶ 55).

According to the straight-line method of reporting interest income, the total amount of the interest to be paid by the customer is deemed to accrue ratably over the entire term of the note. See *The James Brothers Coal Company v. C.I.R.*, 41 T.C. 917, 921, 1964 WL 1307 (Tax Court 1964). In other words, the total interest is divided into equal amounts spread evenly over the amortization period.

The Defendant contends, however, that the interest income related to the sale of the Reacquired Homes should be reported

pursuant to the economic accrual method, rather than the straight-line method. (Stipulation, ¶ 9; Doc. 397, p. 15). According to the economic accrual method, "the interest attributable to the use of money for a period between payments is determined by applying the effective rate of interest on the loan to the 'unpaid balance' of the loan for that period." See *Cooper River Office Building Associates v. C.I.R.,* 1996 WL 24740, at 5 (U.S.Tax Ct.).

It is generally recognized that the computation of interest income according to the economic accrual method, in contrast to the straight-line method, results in the reporting of increased interest amounts in the earlier years of the contract. See *Williams v. C.I.R.,* 94 T.C. 464, 469, 1990 WL 29267 (1990)(A "contract with periodical uniform payments that allocated an equal amount of interest to each year would delay the inclusion of interest relative to the economic accrual method."). See also *Prabel v. C.I.R.,* 91 T.C. 1101, 1107, 1988 WL 138769 (1988).

The Plaintiffs assert that the "attempt by the Internal Revenue Service to accelerate the recognition of income is without valid legal authority and results in a distortion of Plaintiff's true taxable income." (Doc. 205, ¶ 28(i)).

### A. The Defendant is not precluded from litigating the Straight–Line Issue.

In 1992, the Court entered an Order on Cross Motions for Partial Summary Judgment in this adversary proceeding. *In re Hillsborough Holdings Corporation,* 144 B.R. 920 (Bankr.M.D.Fla.1992). The issue before the Court in 1992 was "whether the Debtors may use the straight-line or pro-rata method of calculating interest income on the sale of repossessed property." *In re Hillsborough Holdings Corporation,* 144 B.R. at 920. In 1992, as in the matter currently before the Court, the Defendant asserted that "the Debtors must use the economic accrual method of calculating interest income on the sale of repossessed property." *Id.* at 922. The 1992 Order involved the tax years beginning in 1983 and ending in 1990. (Doc. 397, p. 14; Doc. 398, p. 12).

■ In the 1992 Order, the Court found that the resolution of the Straight–Line Issue "hinge[d] on whether the repossessed properties should be treated as chattels, as urged by the Debtors, or real property, as urged by the Government." The Court further noted that it was "conceded that if the repossessed properties are properly considered chattels for tax purposes, the Debtors are entitled to use the straight line method or pro-rata method of accounting." *Id.* at 922–23.

The Court considered the nature of the Plaintiffs' operations, and determined that JWH "was never in the business of selling real estate." Instead, according to the Court, the land acquired following a foreclosure action was only an incidental consequence of the Plaintiffs' business of selling homes for placement on land owned by their customers. Consequently, the Court granted the Plaintiffs' Motion for Partial Summary Judgment "as to the narrow issue whether the sale of repossessed properties constitutes the sale of chattels," and entered a "partial summary judgment determining that the Plaintiffs' sale of repossessed properties constitutes the sale of chattels." *Id.* at 923–24.

The Plaintiffs contend that the 1992 Order precludes the Defendant from relitigating the Straight–Line Issue because the Order constitutes the law of the case, and also because the Order has collateral estoppel effect. (Doc. 398, pp. 12–18).

The Court finds that the Order does not preclude the Defendant from litigating the

StraightLine Issue for the tax years beginning in 1990 and ending on March 17, 1995.

■ First, the law of the case doctrine does not apply to the 1992 Order. "The law of the case doctrine bars relitigation of issues that were decided, either explicitly or by necessary implication, *in an earlier appeal of the same case.*" *United States v. Jordan,* 429 F.3d 1032, 1035 (11th Cir.2005)(quoted in *In re Waczewski,* 2007 WL 2080423, at *2 (11th Cir.)) (Emphasis supplied). "The law of the case doctrine, self-imposed by the courts, operates to create efficiency, finality, and obedience within the judicial system so that *an appellate decision* binds all subsequent proceedings in the same case." *In re Farris,* 2009 WL 1483524, at *2 (11th Cir.)(quoting *United States v. Amedeo,* 487 F.3d 823, 829 (11th Cir.)) (Emphasis supplied). The 1992 Order is not an appellate decision entered in an earlier appeal from this proceeding, and therefore does not constitute the law of the case.

■■ Second, the 1992 Order does not collaterally estop the Defendant from litigating the Plaintiffs' tax liability for the 1991 through 1995 tax years. "The doctrine of collateral estoppel applies to a federal court judgment when the following three elements are present: 1) the issue at stake is identical to the one involved in the prior litigation; 2) the issue was actually litigated in the prior litigation; and 3) the determination of the issue in the prior litigation was a critical and necessary part of the judgment in that earlier action." *In re Ryals,* 424 B.R. 539, 545 (Bankr.M.D.Fla.2009)(citing *Precision Air Parts, Inc. v. Avco Corp.,* 736 F.2d 1499, 1501 (11th Cir.1984)).

The 1992 Order does not satisfy these requirements. The matter currently before the Court involves different tax years, different installment contracts, and differ-

ent economic markets than presented by the Cross Motions for Summary Judgment in 1992. Additionally, and perhaps more significantly, the only "narrow issue" actually decided in the 1992 Order was that the sale of reacquired property constituted the sale of chattels. *In re Hillsborough Holdings Corporation,* 144 B.R. at 923–24. The Court did not directly address the Plaintiffs' current contention that the straight-line method of reporting interest is a permitted method of accounting that clearly reflects income. (Doc. 398, p. 18).

For these reasons, the Court finds that the 1992 Order does not preclude the Defendant from litigating the Straight–Line Issue for the 1991 through 1995 tax years.

**B. The Internal Revenue Code grants the Commissioner broad discretion to determine whether a method of accounting clearly reflects income.**

■ The starting point for resolution of the Straight–Line Issue is § 446 of the Internal Revenue Code. Section 446 provides in part:

> **§ 446. General rule for methods of accounting**
>
> **(a) General rule.**—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.
>
> **(b) Exceptions.**—If no method of accounting has been regularly used by the taxpayer, or *if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as. in the opinion of the Secretary, does clearly reflect income.*

26 U.S.C. § 446(a), (b)(Emphasis supplied). Under this section, the "taxpayer possesses the initial discretion to deter-

mine what method of accounting it will utilize which, in its view, clearly reflects income. *Mulholland v. United States,* 28 Fed.Cl. 320, 334 (1993), *aff'd,* 22 F.3d 1105, 1994 WL 89037 (Fed.Cir.1994). '[T]he Commissioner then has the authority, under § 446(b) of the Code, to review the taxpayer's choice of method to determine whether said method in fact clearly reflects the taxpayer's income.' *Id.*" *Connecticut Yankee Atomic Power Company v. United States,* 38 Fed.Cl. 721, 725–26 (1997).

■ Treasury Regulation § 1.446–1(a)(2) further underscores the authority granted to the Commissioner under § 446:

**§ 1.446–1 General rule for methods of accounting**

. . .

(2) It is recognized that no uniform method of accounting can be prescribed for all taxpayers. Each taxpayer shall adopt such forms and systems as are, in his judgment, best suited to his needs. *However, no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income.* A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

26 C.F.R. § 1.446–1 (Emphasis supplied). In other words, a taxpayer's chosen method of accounting will "ordinarily" be regarded as clearly reflecting income if it complies with the criteria set forth in Treasury Regulation § 1.446–1. *Shasta Industries, Inc. v. C.I.R.,* T.C. Memo 1986–377, 1986 WL 21581 (U.S.Tax Ct.). Under

§ 446 and Treasury Regulation § 1.446–1, however, the Commissioner has broad discretion to determine whether a particular accounting method clearly reflects income. *Hughes Properties, Inc. v. United States,* 5 Cl.Ct. 641, 646, (1984), *aff'd,* 760 F.2d 1292 (Fed.Cir.1985), *aff'd,* 476 U.S. 593, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986). "The statute does not limit the Commissioner's discretion under section 446(b) by the taxpayer's mere compliance with the methods of accounting generally permitted under section 446(c)." *Ford Motor Co. v. Commissioner,* 102 T.C. 87, 99, 1994 WL 26305 (1994)(quoted in *Ansley–Sheppard–Burgess Company v. C.I.R.,* 104 T.C. 367, 1995 WL 131530 (1995)).

■ Where the Internal Revenue Service determines that a taxpayer's accounting method does not clearly reflect income, the Commissioner's decision "is entitled to more than the usual presumption of correctness and 'should not be interfered with unless clearly unlawful.'" *Connecticut Yankee Atomic Power Company v. United States,* 38 Fed.Cl. at 726(quoting *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 532, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979)). "The Supreme Court made clear in *Thor* that the Commissioner's rejection of the taxpayer's accounting method would be upheld unless the taxpayer showed that it was 'clearly unlawful' or 'plainly arbitrary.'" *In re Heilig Meyers Company,* 232 Fed.Appx. 240, 249–50, 2007 WL 1417153 (4th Cir.). The "Commissioner's interpretation of the 'clear-reflection standard' [of section 446(b)] 'should not be interfered with unless clearly unlawful.'" *Mid–del Therapeutic Center, Inc. v. C.I.R.,* T.C. Memo.2000–130, 2000 WL 366262, at *6 (U.S.Tax Ct.)(quoting *Thor Power Tool Co. v. Commissioner,* 439 U.S. at 532, 99 S.Ct. 773).

■ Under this standard, the "role of the Court is not to 'determine whether in

its own opinion ... a [taxpayer's] method of accounting clearly reflects income but to determine whether there is an adequate basis in law for the Commissioner's conclusion that it did not.' " *American Fletcher Corporation v. United States,* 1986 WL 5441, at *2 (S.D.Ind.)(quoting *R.C.A. v. United States,* 664 F.2d 881, 886 (2d Cir. 1981)). "In reviewing the Commissioner's determination that the taxpayer's method of accounting does not clearly reflect income, the function of the Court is to determine whether there is an adequate basis in law for the Commissioner's conclusion." *Ansley–Sheppard–Burgess Company v. C.I.R.,* 104 T.C. at 371(citing *RCA Corp. v. United States,* 664 F.2d 881, 886 (2d Cir. 1981)).

■ Given the broad discretion granted to the Internal Revenue Service, it is clear that the "taxpayer bears the heavy burden of showing that the Commissioner's determination is plainly arbitrary." *Connecticut Yankee,* 38 Fed.Cl. at 726. "To prevail, a taxpayer must prove that the Commissioner's determination is arbitrary and capricious and without sound basis in fact or law." *Mid–del Therapeutic Center, Inc. v. C.I.R.,* 2000 WL 366262, at *6. The taxpayer bears a heavy burden to overcome the commissioner's determination that a method of accounting does not clearly reflect income, and to establish that the Commissioner abused his discretion. *Kohler Co. and Subsidiaries v. United States,* 124 F.3d 1451, 1457 (Fed. Cir.1997); *Prabel v. Commissioner,* 91 T.C. 1101, 1111–13, 1988 WL 138769 (1988), *aff'd* 882 F.2d 820 (1989)(quoted in *Estate of Ratliff v. C.I.R.,* 101 T.C. at 278–79).

In this case, the Plaintiffs do not affirmatively assert that the Defendant's determinations are arbitrary or unlawful. Instead, the Plaintiffs assert that the straight-line method of reporting interest

clearly reflects income for two primary reasons: (1) the method is permitted by Proposed Treasury Regulation § 1.446–2(e)(3); and (2) the Plaintiffs consistently applied the method for over thirty years. (Doc. 398, p. 18). The Court finds that neither basis is sufficient to overturn the Defendant's determination pursuant to § 446 of the Internal Revenue Code and Treasury Regulation § 1.446–1.

**1. The Defendant's rejection of the Straight–Line method is not clearly unlawful or plainly arbitrary.**

■ First, the Plaintiffs rely on Proposed Treasury Regulation § 1.446–2(e)(3) to support their contention that the straight-line method clearly reflects income. (Doc. 398, pp. 18–20). Treasury Regulation § 1.446–2 relates specifically to methods of accounting for interest payments. Proposed Regulation § 1.446–2(e)(3) provides in part:

**§ 1.446–2 Method of accounting for interest**

. . .

**(e) Allocation of interest to payments**

. . .

**(3) Allocation respected in certain small transactions—(i) In general.—**If the aggregate amount of interest and principal payable under a contract does not exceed $250,000 and section 483 does not apply to the loan, an express allocation of the payments between interest and principal by the parties is respected.

Prop. Treas. Reg. § 1.446–2(e)(3). The Plaintiffs acknowledge that subsection (e)(3) is a proposed regulation that has not been finalized. (Doc. 398, p. 19). Nevertheless, the Plaintiffs assert that the loans at issue in this case satisfy the requirements of § 1.446–2(e)(3), and that they are

entitled to rely on the proposed regulation to justify their reporting of interest income based on the straight-line method of accounting. The parties have stipulated, for example, that "all sales contracts and promissory notes issued in connection with the sale of Reacquired Homes had a total of payments less than $250,000." (Stipulation, ¶ 46). Additionally, the Plaintiffs assert that a typical contract included the following term:

> Buyer and Seller agree that the Finance Charge will be recognized for Federal Income Tax purposes in equal parts over the life of this contract.

(Doc. 398, n. 12). Accordingly, the Plaintiffs contend that Proposed Regulation § 1.446–2(e)(3) "allows the use of the straight-line method for the Notes" at issue in this case. (Doc. 398, p. 20).

The Defendant rejected the Plaintiffs' use of the straight-line method of reporting their interest income for at least three reasons.

1. According to the Defendant, § 461 of the Internal Revenue Code and Revenue Ruling 83–84 relate to deductions from income that are allowed to borrowers, and require the use of the economic accrual method in computing the deductions. The Defendant contends that a borrower's deductions must "match" the addition to income paid to the lender. Consequently, the Defendant concludes that the Plaintiffs must use the economic accrual method to report their interest income, since the borrowers are required to deduct their interest payments under that method. (Doc. 397, pp. 28–29).

2. The Plaintiffs did not establish that the straight-line method complies with generally accepted accounting principles under the circumstances of this case. According to the Defendant, Accounting Principles Board Standard 21 (APB 21) provides that methods of amortization other than the economic accrual method may be used "if the results are not materially different from" the results obtained from that method. The Defendant contends that application of the straight-line method to the Notes at issue produces a result that is materially different from the result obtained by the economic accrual method. (Doc. 397, pp. 37–38).

Specifically, in 2000, the Plaintiffs restated their financial statements for the 1991 through 1995 tax years to effectuate the assumption that interest on the Notes had accrued under the economic accrual method rather than the straight-line method. According to the Defendant, the restatement created a substantial increase in the total value of the Note portfolio, thereby demonstrating that application of the straight-line method significantly affected the Plaintiffs' financial reports and tax obligations. (Doc. 397, pp. 38–41).

3. Even if the Plaintiffs were entitled to rely on Proposed Treasury Regulation § 1.446–2(e)(3), and even if the contracts contained an express allocation of payments between interest and principal, the Defendant contends that the Plaintiffs did not honor the allocation. Specifically, the Plaintiffs' customers were only aware of the 10% interest rate stated in the contracts and only claimed deductions for the stated interest, whereas the Plaintiffs reported interest income on both the stated interest and the "unstated interest" or discount associated with the Notes. According to the Defendant, therefore, any allocation expressed in the contracts is not entitled to respect. (Doc. 397, pp. 31–32).

For these reasons, the Defendant asserts that the straight-line method for reporting interest income on the Notes did not clear-

ly reflect the Plaintiffs' income for the years at issue.

The Court has considered each of the Defendant's reasons for rejecting the Plaintiffs' use of the straight-line method, and finds that its determination is not "clearly unlawful" or "plainly arbitrary." *Thor Power Tool Co. v. Commissioner,* 439 U.S. at 532, 99 S.Ct. 773. There is an adequate basis in law and fact for the Defendant's conclusion that the Plaintiffs' use of the straight-line method of accounting did not clearly reflect income. *American Fletcher Corporation v. United States,* 1986 WL 5441, at *2.

**2. The Defendant is not bound by the Plaintiffs' use of the Straight-Line method in other years.**

▄▄ Second, the Plaintiffs contend that the straight-line method is appropriate because they "consistently applied the method for over thirty years." (Doc. 398, p. 18). The Plaintiffs' contention in this regard is not persuasive. A taxpayer's use of a particular accounting method for an extended period of time does not prohibit the Defendant from later challenging the method if it determines that its application does not clearly reflect income. In fact, the Defendant may even consent to the use of a method for a specific tax year, and subsequently withdraw its consent for other tax years based on its evaluation of the taxpayer's income.

▄▄ In response to an argument that the Commissioner was bound by its prior consent to the taxpayer's use of a particular accounting method, for example, the Eleventh Circuit Court of Appeals stated:

> We cannot agree that the Commissioner is thereby barred from changing Taxpayer's accounting method during a subsequent year in which it becomes apparent that the method does not clearly reflect income.... Greater experience with the actual effects of the method or a significant change in the nature of the taxpayer's business may convince the Commissioner that the consent given for earlier years is no longer appropriate.... His decision to consent, for whatever reason, to the use of a method in one year cannot bind his hands in perpetuity. As long as he has not abused his discretion in determining that income is not clearly reflected by the taxpayer's method, the Commissioner may require a change.

*Knight–Ridder Newspapers, Inc. v. United States,* 743 F.2d 781, 793 (11th Cir.1984). "The fact that the Commissioner had the opportunity to, but did not, change an improper method of accounting in an earlier year does not mean that he is estopped from making the change in the later year." *Suzy's Zoo v. C.I.R.,* 114 T.C. 1, 14 n. 10, 2000 WL 5257 (2000). The Commissioner's acceptance of the taxpayer's use of an accounting method in prior years does not justify continued use of the method if it is otherwise erroneous. *J.P. Sheahan Associates, Inc. v. C.I.R.,* 1992 WL 80927 (Tax Ct.).

▄▄ In this case, the Defendant has the discretion to determine that the Plaintiffs' use of the straightline method does not clearly reflect income for the 1991 through 1995 tax years, even though the Plaintiffs had used the method for more than thirty years.

**II. The Discount Issue**

The parties stipulated that "JWH reported on its tax return as Returns and Allowances a 'discount' thus reducing gross receipts. This 'discount' was taken on each individual note. The discount was derived by multiplying a discount percentage by the stated amount financed in the contract.... The Plaintiffs contend that they derived the discount percentages to

achieve what the taxpayer contends it believed was a market rate of return." (Stipulation, ¶ 28).

The parties further stipulated that "[f]or the 1991–1995 fiscal years before the Court, the sales of the Reacquired Homes were reported for federal income tax purposes as either 'Sales' by JWH or as an offset to 'Bad Debts' by MSH. In either case the amount reported equaled the stated amount financed in the installment sales contracts plus any down payment offset by the discounts associated with the related installment sales contracts." (Stipulation, ¶ 49).

Finally, the parties stipulated that "MSH reported the amortization of the discounts over the life of the sales contracts and related promissory notes as additional interest income in its financial statements and on its Federal Income tax returns." (Stipulation, ¶ 52).

In other words, when the Plaintiffs sold a Reacquired Home, the purchaser executed a Promissory Note in a specific face amount, with interest at the rate of 10%. The Plaintiffs, however, did not report the full face amount of the Notes as "net sales" on its tax returns at the time that the sales occurred. The "net sales" were reported in an amount less than the principal amount of the Notes. The difference between the face amount of the Notes and the amounts reported as "net sales" was treated as "unstated interest" by the Plaintiffs. The "unstated interest" or "discount" for each Note was calculated in an amount designed to produce an "effective interest rate" on the Notes of 13%, rather than the stated interest rate of 10%. The Plaintiffs then amortized the discount and reported it as interest income over the life of the Notes. (Doc. 398, pp. 8–10).

The Defendant contends that the Plaintiffs are required to report the full face amount of the Notes as income in the year that the sales occurred, since the amount on the Notes represents the true sale price of the Reacquired Homes. (Doc. 397, pp. 41–42).

## A. The Defendant is not precluded from litigating the Discount Issue.

In 1993, the Court entered a second Order on Cross Motions for Summary Judgment in this adversary proceeding. (Doc. 43). In connection with the 1993 Order, the Court addressed the Defendant's contention that the Plaintiffs must "recognize the unstated interest as income in one lump sum in the first year of the note, rather than spread-out over the life of the mortgage note." (Doc. 43, p. 4).

In evaluating the issue, the Court emphasized that the notes generated by JWH from the sale of Reacquired Property were all transferred to MSH at the end of each month. (Doc. 43, p. 3). In light of the intercompany transfers, the Court concluded that the Plaintiffs actually received only the discounted amount of the Notes as income. (Doc. 43, pp. 6–7). Consequently, the Court granted the Plaintiffs' Motion for Summary Judgment, and concluded that the Plaintiffs were permitted to "reclassify the unstated interest factor contained in the purchase price of the home." (Doc. 43, p. 7).

As with the 1992 Order, the Plaintiffs contend that the 1993 Order precludes the Defendant from relitigating the Discount Issue because the 1993 Order constitutes the law of the case, and also because the Order has collateral estoppel effect. (Doc. 398, pp. 12–18).

For the same reasons discussed in connection with the 1992 Order, the law of the case doctrine does not apply to the 1993 Order. The 1993 Order is not an appellate decision entered in an earlier

appeal from this proceeding. See *United States v. Jordan,* 429 F.3d at 1035.

■ Additionally, the 1993 Order does not collaterally estop the Defendant from litigating the Plaintiffs* tax liability for the 1991 through 1995 tax years. See *In re Ryals,* 424 B.R. at 545.

The 1993 Order involved the tax years beginning in 1983 and ending in 1990. Accordingly, the matter currently before the Court relates to different tax years, different installment contracts, and different economic markets than presented by the prior Motions for Summary Judgment. Further, the focus of the 1993 Order was whether the discounts were taken at the time of the sale, or at the time of the intercompany transfer from JWH to MSH. In the present matter, the parties have stipulated that the contracts were reported as "sales" by JWH, or as offsets to "bad debts" by MSH, and that the amounts reported were the same in both instances. (Stipulation, ¶ 49). The timing and effect of the intercompany transfers are not directly at issue in the matter currently before the Court.

The 1993 Order does not preclude the Defendant from litigating the Discount Issue for the 1991 through 1995 tax years.

**B. The discount reflects the economic substance of the sales.**

■ The parties stipulated that the Straight–Line Issue and the Discount Issue are "timing issues; that is, they concern when income is required to be recognized for income tax purposes." (Stipulation, ¶ 2).

The general rule governing the time that income must be reported for tax purposes is set forth in § 451 of the Internal Revenue Code. Section 451(a) provides that any item of income shall be reported in the taxpayer's gross income "for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." 26 U.S.C. § 451(a). See also 26 C.F.R. § 1.451–1, which provides that "[g]ains, profits, and income are to be included in gross income for the taxable year in which they are actually or constructively received by the taxpayer unless includible for a different year in accordance with the taxpayer's method of accounting."

This case involves the Notes received by the Plaintiffs when a Reacquired Home was sold to a new purchaser. The Discount Issue involves whether the full face amount of the Notes must be reported as income at the time that the sale occurred, or whether the Plaintiffs may recharacterize a portion of the Notes as unstated interest that may be reported over the life of the Notes.

Both parties look to Accounting Principles Board Opinion 21 (APB 21) to evaluate whether the recharacterization is permissible under § 451 of the Internal Revenue Code. (Doc. 398, pp. 30–32; Doc. 397, pp. 49–59). The purpose of APB 21 is to ensure that the reporting of a noteholder's income reflects "the underlying economic substance" of the transactions. *In re Chateaugay Corporation,* 109 B.R. 51, 55 (Bankr.S.D.N.Y. 1990).

Paragraph 12 of APB 21 is worthy of recitation in its entirety:

12. NOTE EXCHANGED FOR PROPERTY, GOODS, OR SERVICE. When a note is exchanged for property, goods, or service in a bargained transaction entered into at arm's length, *there should be a general presumption that the rate of interest stipulated by the parties to the transaction represents fair and adequate compensation to the*

*supplier for the use of the related funds. That presumption, however, must not permit the form of the transaction to prevail over its economic substance and thus would not apply if (1) interest is not stated, or (2) the stated interest rate is unreasonable (paragraphs 13 and 14) or (3) the stated face amount of the note is materially different from the current cash sales price for the same or similar items or from the market value of the note at the date of the transaction.* In these circumstances, the note, the sales price, and the cost of the property, goods, or service exchanged for the note should be recorded at the fair value of the property, goods, or services or at an amount that reasonably approximates the market value of the note, whichever is the more clearly determinable. That amount may or may not be the same as its face amount, and any resulting discount or premium should be accounted for as an element of interest over the life of the note (paragraph 15). In the absence of established exchange prices for the related property, goods, or service or evidence of the market value of the note (paragraph 9), the present value of a note that stipulates either no interest or a rate of interest that is clearly unreasonable should be determined by discounting all future payments on the notes using an imputed rate of interest as described in paragraphs 13 and 14. This determination should be made at the time the note is issued, assumed, or acquired; any subsequent changes in prevailing interest rates should be ignored.

(Joint Exhibit 71, APB 21, ¶ 12)(Emphasis supplied). Under APB 21, therefore, it is generally presumed that an interest rate stated in a Note represents fair compensation for use of the lender's money. That presumption may be overcome, however, if the stated interest rate is unreasonable, or if the stated face amount of the Note is materially different from the market value of the Note on the date of the transaction.

In this case, the Court finds that the Plaintiffs have overcome the presumption that the stated interest rate of 10% represents fair and adequate compensation under the Notes. In order to accurately reflect the economic substance of the financed sales, the Plaintiffs should be permitted to recharacterize a portion of the Notes as unstated interest.

Paragraph 13 of APB 21 serves as guidance for determining whether the stated interest rate was appropriate. Paragraph 13 provides in part:

13. DETERMINING AN APPROPRIATE INTEREST RATE. The variety of transactions encountered precludes any specific interest rate from being applicable in all circumstances. However, some general guides may be stated. The choice of a rate may be affected by the credit standing of the issuer, restrictive covenants, the collateral, payment and other terms pertaining to the debt, and, if appropriate, the tax consequences to the buyer and seller. The prevailing rates for similar instruments of issuers with similar credit ratings will normally help determine the appropriate interest rate for determining the present value of a specific note at its date of issuance.

(Joint Exhibit 71, APB 21, ¶ 13). Application of this standard to the Plaintiffs' Notes warrants the conclusion that the 10% interest rate stated in the Notes was not fair and adequate compensation for use of the Plaintiffs' funds. The Court reaches this conclusion primarily because (1) the Notes represent high risk loans, and (2) the interest rate stated in the Notes is below market.

### 1. The Notes represent high risk loans.

First, the Court is satisfied that the Notes represent high risk loans because of the characteristics of the Plaintiffs' customers and the nature of the collateral. The parties stipulated that "JWH concentrated on the low to moderately priced segment of the housing market." (Stipulation, ¶ 14).

According to the report of the Plaintiffs' expert witness, W. Barefoot Bankhead (Bankhead), the Plaintiffs' customers were generally "subprime" purchasers, meaning that they "had negative credit histories and/or high debt-to-income ratios." In addition to classification of the purchasers as subprime, Bankhead stated that the Notes should also be considered subprime based on their particular attributes. "These attributes include lack of appraisals, high LTV [loan-to-value] ratios, lack of private mortgage insurance ('PMI'), the Company's higher default experience with resales, rural location of the properties, lack of requirement of flood insurance, and not escrowing taxes or insurance." Bankhead's report states that the LTV ratios were "almost always greater than 100% due to the fact that minimal down payment was required, and the value of the home was lower than the principal amount of the Note." (Joint Exhibit 73, ¶¶ 27–29).

Further, Bankhead testified at trial that the Notes generally involved significant credit risks.

It's my opinion that Walter Industries' borrowers was a fairly typical subprime credit in looking at the portfolio as a whole. . . .

These are borrowers that have impaired credit histories because they have a history of delinquencies or charge-offs or judgments, maybe have been in bankruptcy, have had homes foreclosed upon and/or they have high debt-to-income ratios and the-at least in the cases of the resales, in most every instance the loan to value was 100 percent or in some cases higher because of the discounting of the note.

So you have borrowing arrangements where the loan to value is 100 percent or more, Walter Homes did not require appraisals to be done to confirm the loan-to-value ratio, they didn't require title insurance, there was no private mortgage insurance. The loans, particularly the resale loans, experienced high ratios of defaults, compared to just sales and then certainly compared to prime mortgage loans. Those would have been some of the characteristics that I believe indicated that these were subprime borrowers.

(Transcript, pp. 131–32). According to Bankhead, the Plaintiffs' typical customer would normally be considered "a B, C, or D type of a credit, very consistent with a subprime borrower." (Transcript, p. 131). See also Joint Exhibit 73, Report of Bankhead, n. 12, for the criteria to determine whether a customer had a "negative credit history."

The Defendant asserted that Bankhead's statistics are not reliable because the sample loans that he reviewed were not representative. (Doc. 397, pp. 66–67). It is not disputed, however, that the Plaintiffs' business was focused on "the low to moderately priced segment of the housing market," as stipulated by the parties. (Doc. 391, ¶ 14). The Plaintiffs' customers were "primarily low income, blue collar or agriculturally employed. Most of them lived in a rural environment and they were-had low credit ratings." (Transcript, Testimony of William H. Weldon, p. 22). Under these circumstances, the Court accepts Bankhead's opinion that the Notes represent high risk loans because of the characteristics of the Plaintiffs' customers, and be-

cause of the nature of the collateral and the arrangement.

The high risk nature of the loans supports the conclusion that the 10% interest rate stated in the Notes was not fair and adequate compensation for use of the Plaintiffs' funds.

### 2. The interest rate stated in the Notes is below market.

Second, the Court is satisfied that the market rate of interest for the Notes was higher than the 10% rate stated in the Plaintiffs' contracts.

The evidence establishes that the effective rate of interest on the Notes, after accounting for the discount, was 13%.

> The entire population of 1990–1995 resale Notes was analyzed to determine the effective interest rates calculated by the Company during this period. The Company discounted its Notes to achieve an effective interest rate that averaged approximately 13% during the 1990–1995 timeframe.

(Joint Exhibit 73, Report of Bankhead, ¶ 24). According to William H. Weldon, a former controller and financial officer for the Plaintiffs, the effective rate was computed to reflect a market rate of return on the Notes, based upon the Plaintiffs' borrowing costs, estimated future interest rates, service and collection costs, estimated losses due to repossessions, a reasonable profit, and "what competitive companies were charging as a market rate of return." (Transcript, pp. 25, 27).

In other words, the stated interest rate of 10% would have resulted in a return that was below market, and the discount was therefore computed to arrive at a rate that was consistent with rates charged on comparable loans. According to Bankhead,

During the 1991–1995 timeframe that was analyzed, the prevailing market rate of interest was higher than 10% and thus a discount was required to reduce the sales price to the present value of the home and increase the interest rate of 10% to the prevailing market rate. (Joint Exhibit 73, ¶ 16). At trial, Bankhead testified as to his conclusion that "based again upon the typical Walter Homes borrower and the borrowing arrangement that the 10 percent rate was below a fair market rate of interest over the time period 1990 to 1995." (Transcript, p. 129).

More specifically, Bankhead's report contains the following conclusion from his evaluation of the Plaintiffs' resale Notes:

> The prevailing market rate for the Company's mortgage portfolio, given the attributes of the Resale Notes and the credit profiles of the customers, would be expected to fall within a range of 3% to 6% greater than the prime rate. From 1990 to 1995, the 13% effective yield utilized for discounting purposes by the Company falls within that range (with few exceptions) and the 10% stated rate fall below that range (with few exceptions). Therefore the 10% rate is unreasonable.

(Joint Exhibit 74, ¶ 4). At trial, Bankhead also confirmed that the 13% effective yield was consistent with the market rate for loans of similar credit risk during the time period at issue. (Transcript, p. 138).

According to Bankhead, therefore, if the Notes "were not discounted, the Company would not have been following GAAP, the Net Sales recognized in the period the sale occurred would have been overstated, and the interest income recognized over the life of the Notes would have been understated." (Joint Exhibit 73, ¶ 17).

Bankhead's ultimate conclusion that the discount was necessary to reflect the true

sales price for the Reacquired Homes is significant because of the purpose of APB 21. As set forth in the Introduction to APB 21:

> The use of an interest rate that varies from prevailing interest rates warrants evaluation of whether the face amount and the stated interest rate of a note or obligation provide reliable evidence for properly recording the exchange and subsequent related interest. This Opinion sets forth the Board's views regarding the appropriate accounting when the face amount of a note does not reasonably represent the present value of the consideration given or received in the exchange. This circumstance may arise if the note is noninterest bearing or has a stated interest rate which is different from the rate of interest appropriate for the debt at the date of the transaction. Unless the note is recorded at its present value in this circumstance the sales price and profit to a seller in the year of the transaction and the purchase price and cost to the buyer are misstated, and interest income and interest expense in subsequent periods are also misstated.

(Joint Exhibit 71, APB 21, ¶ 1). Where the stated interest rate is below market, therefore, a discount should be applied so that the sales price and interest rate reflect the "economic substance" of the transaction. (Joint Exhibit 71, APB 21, ¶ 12).

In this case, the evidence establishes that the 10% interest rate stated in the Notes did not reflect the market rate of interest for the loans, and did not represent fair and adequate compensation for use of the Plaintiffs' funds. Consequently, the Court concludes that the discount was appropriate to record the economic substance of the sales.

## Conclusion

The Plaintiffs and the Defendant agreed that two issues remain for consideration in this proceeding: (1) the Straight–Line Issue, which involves whether the Plaintiffs may report their interest income according to the straight line method of accounting, or whether they must report the interest income according to the economic accrual method of accounting; and (2) the Discount Issue, which involves whether the full face amount of the Plaintiffs' Notes must be reported as income at the time that the underlying sale occurred, or whether the Plaintiffs may recharacterize a portion of the Notes as unstated interest that may be reported over the life of the Notes.

First, the Court finds that the Plaintiffs did not show that the Defendant's rejection of the straight line method of accounting was clearly unlawful or plainly arbitrary. The Defendant has the discretion to determine that use of the straight line method does not clearly reflect income, even though the Plaintiffs have used the method for more than thirty years.

Second, the Court finds that the Plaintiffs may recharacterize a portion of the Notes as interest income that is reportable over the life of the Notes. The Notes represent high risk loans, and the 10% interest rate stated in the Notes was below the market rate of interest for the loans during the 1991 through 1995 periods. Consequently, the discount was appropriate to reflect the economic substance of the sales.

Accordingly:

**IT IS ORDERED** that:

1. The Plaintiffs, Hillsborough Holdings Corporation, et al., are required to apply the economic accrual method of accounting, as determined by the Defendant, the United States of America, to report

the interest income on installment Notes received from the sale of Reacquired Homes during the 1991 through 1995 tax periods.

2. For the 1991 through 1995 time period, the Plaintiffs, Hillsborough Holdings Corporation et al., may reclassify a portion of the amount financed pursuant to the sale of Reacquired Homes as "unstated interest," and report the unstated interest as income over the life of the Notes.

3. A separate Final Judgment on the Plaintiffs' Third Amended Complaint shall be entered consistent with these Findings of Fact and Conclusions of Law.